A. H. PHILLIPS, INC. *v.* WALLING, ADMINISTRATOR OF THE WAGE AND HOUR DIVISION, U. S. DEPARTMENT OF LABOR.

No. 608. Argued March 2, 1945.—Decided March 26, 1945.

*Mr. Joseph B. Ely,* with whom *Messrs. Frederick M. Kingsbury* and *Edward T. Collins* were on the brief, for petitioner.

*Miss Bessie Margolin,* with whom *Solicitor General Fahy, Messrs. Robert L. Stern, Douglas B. Maggs* and *Archibald Cox* were on the brief, for respondent.

*Mr. Charles B. Rugg* filed a brief on behalf of the American Retail Federation, as *amicus curiae,* urging reversal.

MR. JUSTICE MURPHY delivered the opinion of the Court.

Section 13 (a) (2) of the Fair Labor Standards Act of 1938, 52 Stat. 1060, 1067, 29 U. S. C. § 213 (a) (2), states that the wage and hour provisions of the Act shall not apply with respect to "any employee engaged in any retail or service establishment the greater part of whose selling or servicing is in intrastate commerce." The issue posed by this case is whether employees working in the warehouse and central office of an interstate grocery chain store system are "engaged in any retail . . . establishment" within the meaning of § 13 (a) (2) so as to be exempt from the wage and hour provisions.

The petitioner corporation operates a chain of 49 retail grocery stores in cities and towns within a 35-mile radius from Springfield, Massachusetts. Of these stores, 40 are in Massachusetts and 9 are in Connecticut. Quite apart from

these retail stores, petitioner maintains a separate warehouse and office building in Springfield in which work the employees involved in this case.

The warehouse is the only one maintained by petitioner and it services all the 49 stores. Except for bread, pastry and milk, which are secured from local sources, all of petitioner's merchandise is delivered by rail and truck to the warehouse where it is divided and then delivered by petitioner's trucks to the individual stores according to need. About 80% of the merchandise passing through the warehouse is received from outside Massachusetts, while about 18% of the total sales by dollar volume of the merchandise shipped from this warehouse is accounted for by petitioner's Connecticut stores. Each week a regular order is delivered to each store from the warehouse and additional deliveries are made as required. Merchandise is supplied on the basis of requisitions prepared by individual store managers, subject to revision by one of the three superintendents in the central office. All of petitioner's sales are made exclusively at the retail stores and no deliveries to customers are made from the warehouse.

Employees in the central office, which is located in the same building as the warehouse, perform the usual functions of checking invoices, paying bills, making out payrolls, keeping inventory records, checking store deliveries and the like. The various employees in the warehouse and the truck drivers handle the physical work connected with the receipt, storage and shipment of merchandise. None of these employees segregates his time as between interstate and intrastate shipments; both types of shipments are handled indiscriminately to and from the warehouse.

On the basis of these facts, the Administrator of the Wage and Hour Division sought to enjoin petitioner from violating the overtime and record provisions of the Act. The District Court granted the injunction, holding (1)

that the warehouse and central office employees were engaged in interstate commerce within the meaning of the Act and (2) that they were not exempted from the wage and hour provisions by reason of § 13 (a) (2) since the warehouse and office building did not constitute a retail establishment. 50 F. Supp. 749. The First Circuit Court of Appeals affirmed as to both points. 144 F. 2d 102. Petitioner, however, has sought review here only as to the second point. And certiorari was granted because of the conflicting views expressed on this issue by lower appellate courts.[1]

The Fair Labor Standards Act was designed "to extend the frontiers of social progress" by "insuring to all our able-bodied working men and women a fair day's pay for a fair day's work." Message of the President to Congress, May 24, 1934. Any exemption from such humanitarian and remedial legislation must therefore be narrowly construed, giving due regard to the plain meaning of statutory language and the intent of Congress. To extend an exemption to other than those plainly and unmistakably within its terms and spirit is to abuse the interpretative process and to frustrate the announced will of the people. We accordingly agree with the two courts below that the exemption contained in § 13 (a) (2) is inapplicable in this case and that the employees involved are entitled to the benefits of the wage and hour provisions of the Act. We hold, in other words, that the warehouse and central office of petitioner's chain store system cannot properly be considered a retail establishment within the meaning of § 13 (a) (2).

---

[1] The decision below in this case is in accord with the reasoning of *Walling* v. *American Stores Co.,* 133 F. 2d 840 (C. C. A. 3), but is in conflict with *Allesandro* v. *C. F. Smith Co.,* 136 F. 2d 75 (C. C. A. 6), *Walling* v. *L. Wiemann Co.,* 138 F. 2d 602 (C. C. A. 7), and *Walling* v. *Block,* 139 F. 2d 268 (C. C. A. 9).

It is necessary, in the first place, to understand the true nature of petitioner's warehouse and office. The prime function of petitioner's chain store system is to sell groceries at retail. Like most large chains, however, petitioner has found it economically feasible to perform and integrate both the retail and wholesale functions of the grocery business. The independent wholesaler or middleman has been eliminated from the channel of distribution of petitioner's merchandise. Petitioner not only operates the retail outlets but purchases the merchandise in quantity from producers, stores it in a warehouse and systematically allots it to the individual stores. Certain economies in operation result from the direct mass buying and centralized merchandising control which would otherwise be impossible to achieve.[2] A warehouse and a central office such as petitioner maintains are vital factors in this integration of the retail and wholesale functions. They are necessary instruments for the successful performance of the wholesale aspects of a multi-function business of this type.

There are, to be sure, certain distinctions between the wholesale activities of a chain store system and those of an independent wholesaler. Thus a chain store enterprise does not customarily sell merchandise in its warehouse to retailers or other wholesale customers as does an independent wholesaler.[3] The goods stored in a chain store warehouse are merely distributed rather than sold to the retail stores. See *Liggett Co.* v. *Lee,* 288 U. S. 517, 537, 538. But this and other differences that can be found arise from the fact that the chain organizations have completely

---

[2] See Beckman and Nolen, The Chain Store Problem (1938), pp. 48–50.

[3] Although petitioner's warehouse apparently does no wholesale business with independent retailers, many chain store warehouses sell certain quantities of merchandise to outside retailers in addition to supplying their own retail outlets. Beckman and Nolen, The Chain Store Problem (1938), p. 8.

meshed the retail and wholesale functions. Many of the costs and risks normally assumed by the wholesale merchant because of his independent and competitive nature are eliminated by the chain store organization. The resulting savings and simplifications serve only to emphasize some of the major effects of the apparent trend away from the independent middleman in our economy of distribution.[4] The disappearance of the independent middleman, together with many of his separate operations and charges, does not mean, however, that his essential intermediary or wholesale function of moving goods from producer to retailer has been abolished. In this instance it has only been taken over by the retailer, acting through its own distinct wholesale units.[5]

In a realistic sense, therefore, most chain store organizations are merchandising institutions of a hybrid retail-wholesale nature. They possess the essential characteristics of both the retailer and the wholesaler. Their wholesale functions, which are integrated with but are physically distinct from their retail functions, are performed through their warehouses and central offices. That

[4] Does Distribution Cost Too Much?, Twentieth Century Fund (1939), pp. 81–85, 100–110, 178–181, 345–346; Beckman and Nolen, The Chain Store Problem (1938), pp. 7–9, 42–61; 15 Encyclopaedia of the Social Sciences (1935), pp. 411–416.

[5] "While it is frequently said that the function of wholesaling is vital even though the wholesaler may not be in every line, some amplification of this remark seems advisable. *Some agency must provide the machinery to move all merchandise from the producer to the retailer. Regardless of what this function is called, it is essentially the same as wholesaling.* . . . Chain stores, once they assume enough importance to justify a warehouse, are engaged in wholesaling as well as retailing. Whatever goods are handled at retail outlets must be bought in quantity, handled in the warehouse and allotted to the individual stores in much the same way that wholesalers would serve the independent dealers." Chamber of Commerce of the United States, National Wholesale Conference, Report of Committee I, Wholesalers' Functions and Services (1929), pp. 13–14.

fact is the essential key to the problem presented by this case. It serves to make clear the inapplicability of § 13 (a) (2) to petitioner's warehouse and central office employees.

Section 13 (a) (2) by its very terms exempts only those employees engaged in a retail or service establishment operating primarily in local commerce. Petitioner claims that its retail stores, warehouse and central office together constitute a "retail establishment" within the meaning of this exemption. The lack of merit in this claim is obvious. Even if, as petitioner urges, the word "establishment" referred to an entire business or enterprise, the combined retail-wholesale nature of petitioner's interstate business would prevent it from properly being classified as a local "retail establishment." But if, as we believe, Congress used the word "establishment" as it is normally used in business and in government [6]—as meaning a distinct physical place of business—petitioner's enterprise is composed of 49 retail establishments and a single wholesale establishment. Since the employees in question work in the wholesale establishment, § 13 (a) (2) is plainly irrelevant.

Moreover, it is quite apparent from the sparse legislative history of § 13 (a) (2) that Congress did not intend to exempt as a "retail establishment" the warehouse

---

[6] Prior to the adoption of the Fair Labor Standards Act the term "establishment" was used in the sense of physical place of business by many census reports, business analyses, administrative regulations, and state taxing and regulatory statutes. As applied to chain store systems, "establishment" thus described each unit in the chain. For example, under the N. R. A. Codes of Fair Competition, prepared by committees from the industries concerned, retail stores of a grocery chain were subject to the Retail Food and Grocery Trade Code, while the chain store warehouses and central offices were treated as separate "establishments" subject to the Wholesale Food and Grocery Trade Code. See N. R. A. Codes of Fair Competition, Vol. IV, pp. 460–1, 470, and Vol. V, pp. 5–6, 13–14.

and central office of an interstate chain store system. From the standpoint of its legislative ancestry, § 13 (a) (2) is the offspring of a manifest desire to exclude from the scope of the Act "business in the several States that is of a purely local nature." Sen. Rep. 884, 75th Cong., 1st Sess., p. 5. Congress was interested in exempting those regularly engaged in local retailing activities and those employed by small local retail establishments, epitomized by the corner grocery, the drug store and the department store.[7] It felt that retail concerns of this nature do not sufficiently influence the stream of interstate commerce to warrant imposing the wage and hour requirements on them. *Ibid.* p. 5. Section 13 (a) (2) is a part of the Act only because of the fear that § 13 (a) (1), in exempting employees regularly engaged in a "local retailing capacity," did not clearly exclude those employed by local retailers who are situated near state lines and who make occasional interstate sales. *Walling* v. *Jacksonville Paper Co.*, 317 U. S. 564, 571.

Here petitioner's warehouse and central office employees are performing wholesale duties in the very midst of the stream of interstate commerce. They constantly deal with both incoming and outgoing interstate ship-

---

[7] The original language of § 13 (a) (2), introduced as an amendment by Representative Celler, applied to any retail "industry." Representative Celler stated that if the amendment were accepted "retail dry goods, retail butchering, grocers, retail clothing stores, department stores will all be exempt." Several other Congressmen expressed their desire to assure the exemption of "the corner grocery store man or the filling station man" and "the local groceryman, druggist, clothing store, meat dealer—any merchant in fact." 83 Cong. Rec. 7299, 7436–7438. The exemption as it finally emerged from the joint House-Senate conference committee applied to any retail "establishment" rather than "industry." The use of the word "establishment" is more appropriate to the small local retailers which Congress had in mind and clearly indicates that Congress meant by it something less or different than "industry" or "enterprise."

ments. Such tasks are completely unlike those pursued by employees of the small local retailers, who were the sole concern of Congress in § 13 (a) (2). These duties, rather, are economically, functionally and physically like those of the independent wholesaler's employees who, when engaged in interstate commerce, are admittedly entitled to the benefits of the Act. We fail to perceive in § 13 (a) (2) or in its Congressional background any intent to discriminate against chain store employees engaged in wholesale activities or to give to chain store warehouses a competitive advantage in labor costs over independent wholesalers.

We are thus unable to say that the warehouse and central office employees of petitioner's interstate chain store system plainly and unmistakably fall within either the terms or the spirit of the exemption specified in § 13 (a) (2). Economic facts, legal principles and consistent and thorough administrative interpretation [8] of the exemption all compel the conclusion that § 13 (a) (2) is not applicable to the facts of this case. We therefore affirm the judgment of the court below.

*Affirmed.*

The CHIEF JUSTICE, MR. JUSTICE FRANKFURTER and MR. JUSTICE JACKSON concur in the result.

MR. JUSTICE ROBERTS dissents.

---

[8] See Interpretative Bulletin No. 6, United States Department of Labor, Wage and Hour Division, originally issued in December, 1938, and revised in June, 1941. See also First Annual Report of the Administrator of the Wage and Hour Division, United States Department of Labor (1940), p. 21, informing Congress that "each physically separated store of a chain of stores will be considered a separate 'retail establishment.' The warehouses and central executive offices of the chain are not 'retail establishments.'"