## EDWARDS v. RIVERSIDE PRODUCTS CO.

### Civ. No. 403-W.

United States District Court
N. D. West Virginia.

Aug. 30, 1949.

yard had been under the control and immediate direction of the foreman of what was known as the yard gang. He, with his gang, would unload the railroad cars, stack the material, and move it into the plant as called for.

On July 1, 1942, the plaintiff, John W. Edwards, was employed to check arriving material and maintain a running inventory of such material in the yard. His starting wage was $160 a month. On September 1, 1942, this was increased to $200 a month. There were subsequent increases and reductions, the high figure being $250 a month. But until he left the employ of the company about November 1, 1945, his wage never was less than $200 a month. Edwards brings this action under the Fair Labor Standards Act of June 25, 1938, 29 U.S.C.A. §§ 201–219.

The company contends that he does not fall within the provisions of that Act, because he was employed in a bona fide administrative capacity. The sole question presented at this time is whether or not Edwards was or was not employed in an administrative capacity. A jury was waived by both parties, and evidence taken before me to determine this fact. Upon considering the pleadings and the evidence, I now make the following

### Findings of Fact.

1. Plaintiff is a resident of Wheeling, West Virginia, and within the Northern District of West Virginia; defendant is a West Virginia corporation with its principal office located in Wheeling, West Virginia. Defendant operates and maintains a steel fabrication plant in the City of Martins Ferry, Ohio, which plant during the time alleged in the complaint was engaged in the fabrication or processing of sections for ships known as LSTs under a contract with the United States Navy. The answer admits that the company was engaged in interstate commerce, and that plaintiff's employment related to the processing of materials moving in interstate commerce.

2. Plaintiff was employed by defendant on or about July 1, 1942, and worked continuously until the termination of his employment on or about November 1, 1945.

Gilbert S. Bachmann and J. Donald Ezell, Wheeling, West Virginia, for plaintiff.

Goodwin, Nesbitt, Spillers & Mead and Charles P. Mead, Wheeling, West Virginia, for defendant.

BAKER, Chief Judge.

The defendant, Riverside Products Company, under a slightly different corporate title, has been engaged in the fabrication of heavy steel structures for many years. Its principal office is in Wheeling, West Virginia, and it operates a plant in Martins Ferry, Ohio. Beginning in 1942, this company entered into a contract whereby the entire facilities of its Martins Ferry plant were devoted to the fabrication of sections of U. S. Navy vessels, known as L.S.T.s. Riverside Products Company was a subcontractor. It would be shipped steel plates of various dimensions and, what are known in the trade as steel shapes. These consisted of angle irons, channel beams, etc. These plates and shapes would come to the plant on railroad cars. They would be unloaded in a yard adjoining the plant, and moved into the plant as they were needed for fabrication. Prior to July of 1942, the

His starting wage, in gross figures, was $160 a month; on September 1, 1942, it was increased to $200; on September 1, 1943, the gross wage was increased to $250; thereafter, on November 15, 1944, it was reduced to $200 per month and continued thus until the termination of his employment.

3. Plaintiff was employed as a clerk in the "receiving yard." The receiving yard was a large open-air enclosure in which was stored the material shipped from various steel mills pending its movement to the fabricating rooms for processing. The material consisted primarily of large steel plates, angles, beams and channel irons used in the construction of ships. An average day would witness the arrival at the receiving yard of from five to eight gondolas or freight cars of steel from the mills.

4. Plaintiff's duties were as follows: Upon the arrival at the yard of a carload of steel he would obtain the bill of lading from the engineer's office, mount the freight car and proceed to check every piece of steel against the bill of lading. This was done by measuring and counting each item or bundle of identical items. The steel was then unloaded with a crane by the yard crew under the supervision of the yard foreman and stacked about the receiving yard on piles corresponding to the size and type of the material. Plaintiff would thereupon identify each item or bundle with paint and brush by marking thereon code numbers taken from a table prepared and furnished by the United States Navy. This work was done in the open air at all times and under the most adverse weather conditions.

The second phase of plaintiff's duties concerned the movement of the material from the yard to the fabricating rooms. He, as well as the yard foreman, would receive a copy of what was known as a "cutting list" prepared by the engineering department and designating the materials ordered from the yard to the fabricating rooms. Plaintiff would check the items as they were being loaded on a buggy under the supervision of the yard foreman to ascertain if they conformed to the cutting list.

Plaintiff maintained a complete record of all materials received into the yard and of all materials sent to fabrication. He was required to have available at any given time a full inventory of every piece of steel in the yard. On Friday of each week he submitted to the engineering department a report of all material received, what was sent to fabrication and the balance on hand.

5. Plaintiff worked under the supervision of the chief engineer; he had no employees under him nor did he have authority to give orders. The yard crew was under the supervision of the yard foreman who was in turn under the the chief engineer. Plaintiff necessarily worked in conjunction with the yard foreman but not over him. He had no authority to hire or fire, nor was he consulted on questions of employment. He took no part in the direction of company policy and had no say in the administration of the plant. With respect to the receiving and processing of materials, his sole duty was to keep accurate records. He was not concerned with the ordering of steel from the mills, its quality, quantity or date of shipment; and he had nothing to do with the type or amount of material ordered to fabrication. The performance of his duties required no special skill, training or experience. He was required to exercise some discretion and independent judgment as to the place in the yard at which incoming material would be stored. He also on occasion would notify the engineering department that shortages were developing in a given type of material, and suggest that cars containing such material be given priority in movement into the yard. These occasions arose infrequently; perhaps, every five or six weeks (see record page 78), and when they did arise, the same shortage would be reflected on an independent inventory maintained in the office of the Chief Engineer.

### Conclusions of Law.

Section 13(a) of the Act provides in part that it "shall not apply with respect to (1) any employee employed in a bona fide executive, administrative, professional, or * * * capacity."

Under rules and regulations, promulgated by the Administrator, is found the following, See 29 U.S.C.A.Appendix, § 541.2:

"The term 'employee employed in a bona fide * * * administrative * * * capacity' in section 13(a) (1) of the act shall mean any employee—

"(A) who is compensated for his services on a salary or fee basis at a rate of not less than $200 per month (exclusive of board, lodging, or other facilities), and

"(B) (1) who regularly and directly assists an employee employed in a bona fide executive or administrative capacity (as such terms are defined in these regulations), where such assistance is nonmanual in nature and requires the exercise of discretion and independent judgment; * * *."

There are three other excepted classifications, which have no possible bearing on this case.

For the purposes of the question now before me, I do not consider the two months that Edwards was paid only $160, since the complaint in the case, and the exhibits filed therewith, deal only with his employment afer September 1, 1942. I also think it is clearly shown that Edwards' work was nonmanual in its nature. It is true that he was required to be out of doors a great part of the time and he, of course, had to use his hands in measuring the various plates and shapes and in marking them. However, taking the evidence as a whole, I feel it is plain that his work must be considered as having been nonmanual. This leaves only the question of whether or not that work required "the exercise of discretion and independent judgment." That is the sole question before me at this time.

■■ The authorities hold that on this question the burden of proof is on the defendant and that the Act should be strictly construed in favor of the employee. See A. H. Phillips, Inc., v. Walling, 324 U.S. 490, 65 S.Ct. 807, 89 L.Ed. 1095, 157 A.L.R. 876.

The authorities likewise hold that every case must be decided upon its peculiar facts. I feel, however, that two of the cases, which present rather analogous situations, might be commented on.

In Baker et al. v. California Shipbuilding Corp., D.C., 73 F.Supp. 322, it was held that an employee whose work required him to determine the quality and material of its conformations to specifications, was covered by the Fair Labor Standards Act. In this case, the Court said, 73 F.Supp. at page 326: "Mr. Rhodes was during the period relevant to this action classified as section head and material engineer. His work was the same in either classification. It was actually that of chief clerk to the chief material engineer of the hull division of the defendant shipyard corporation. This division prepared all requisitions in the proper manner so that all materials necessary to the hull of the ship, except machinery, could be supplied by the purchasing department of the defendant as approved by the Maritime Commission. He did devote a very brief part of his working time to conferences at which business policies of the shipyard company were discussed, but the greatest part of his duties were routine and involved no authority or independent judgment by Mr. Rhodes. His services, as shown by the evidence, did not put him in any exempt category under the Act under consideration in this case."

And in the case of Steiner v. Pleasantville Constructors, Inc., 181 Misc. 798, 46 N.Y.S.2d 120, 122, it was said: "It is next contended that Gutman was an executive or administrative employee within the meaning of these terms as they are used in the statute. Whether he was such must be determined not from the mere name attributed by plaintiff or defendant to their relationship, but upon his activities. Warren-Bradshaw Drilling Co. v. Hall, 317 U.S. 88, 63 S.Ct. 125, [87 L.Ed. 83]; A. B. Kirschbaum Co. v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638; Schroepfer v. A. S. Abell Co., D.C., 48 F.Supp. 88, 95. An executive is a reasonably well understood term; duties in such capacity relate to active participation in control, supervision and management of a business. Doing routine clerical work is not acting in an executive capacity. An administrator is one who administers; a manager. One

who administers affairs; one who directs, manages, executes or dispenses (Wilkinson v. Noland Co., D.C., 40 F.Supp. 1009, 1011, 1012); in the instant case, the employment classification of Gutman was that of dock clerk; originally, he was hired by defendant's transportation manager as a warehouse and overtime clerk; his duties were to keep track of all cargo brought into the warehouse and to keep a record of all shipments loaded on overtime; subsequently, when the work subsided, Gutman continued this work and also acted as receiving clerk and checker and did odd jobs that had to be done. It is true, that he sometimes directed the work of other employees; he did not do so, customarily or regularly; neither was his primary duty the direction of a customarily recognized department of the defendant. 'It can hardly be held that it is unreasonable, for the purposes of this Act, to classify an employee as not being a bona fide executive when a fifth of his work is that of ordinary nonexempt employees of the same employer' (Knight, Inc., v. Mantel, 8 Cir., 135 F.2d 514, 518), Gutman was not an executive or administrative employee."

Both of these cases presented situations where a much stronger argument could be made for the fact that the employee involved was required to exercise discretion and independent judgment than does the case before me. While the facts involved in the Edwards' case are admittedly close, I feel that the evidence preponderates in Edwards' favor, and certainly that the defendant has failed to meet the burden of proof required of it. I, therefore, find as a matter of law that John W. Edwards was an employee covered by the Fair Labor Standards Act, and should have been compensated accordingly.

Counsel have indicated that upon my ruling on this question they can probably agree upon the amount of recovery. If they are able to so agree, a judgment order carrying out my views should be presented. If they cannot agree, I will enter an order of reference to a Master to determine what the recovery should be.