**John T. DUNLOP, Secretary of Labor, United States Department of Labor**

v.

**The NEW HAMPSHIRE JOCKEY CLUB, INC. and New Hampshire Trotting and Breeding Association, Inc.**

**Civ. A. No. 75–145.**

United States District Court, D. New Hampshire.

Sept. 29, 1976.

John S. Casler, U. S. Dept. of Labor, Boston, Mass., for plaintiff.

Richard S. Snierson, McLane, Graf, Greene, Raulerson & Middleton, Manchester, N. H., for defendants.

## OPINION

BOWNES, District Judge.

The Department of Labor alleges that the defendants have willfully violated the overtime provisions of the Fair Labor Standards Act of 1938 (the Act), as amended, 29 U.S.C. § 201 *et seq.*, by failing to pay their employees time and one-half for hours worked in excess of forty hours per week for the years 1973 and 1974.

The defendants admit that in certain instances employees have not received time and one-half for hours worked in excess of forty per week, but claim that they are exempt from the overtime provisions of the Act by virtue of 29 U.S.C. § 213(a)(3) (Supp. 1976) which provides that such provisions shall not apply with respect to

> any employee employed by an establishment which is an amusement or recreational establishment, if (A) it does not operate for more than seven months in any calendar year, or (B) during the preceding calendar year, its average receipts for any six months of such year were not more than 33⅓ per centum of its average receipts for the other six months of such year; . . .

It has been stipulated that a race track conducting parimutuel racing is engaged in activity which comes within the term

"amusement or recreational" as used in the exemption.

Defendants do not dispute that their activities are interstate commerce within the meaning of the Act.

The basic issue is whether the defendants are exempt from coverage pursuant to the exemption provision quoted above.

The first question is whether or not the activities of the defendants constitute one "establishment" under the exemption as the plaintiff claims or two "establishments" as the defendants assert.

If the defendants are found to be two "establishments," the plaintiff concedes that the exemption applies and there is no liability.

If the defendants are found to constitute one "establishment," then they further claim that they are exempt by reason of the "receipts" portion of the exemption.

The defendants also assert "good faith" as a defense.

Finally, defendants claim that there was not a willful violation, and, hence, the two year statute of limitations and not the three year statute applies.

## THE ESTABLISHMENT ISSUE

I address myself first to the "establishment" question. It is clear that exemptions to the Act are to be narrowly construed and that the defendants have the burden of pleading and proving that the exemption applies. *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960); *Mitchell v. Kentucky Finance Co.*, 359 U.S. 290, 295, 79 S.Ct. 756, 3 L.Ed.2d 815 (1959); *Phillips, Inc. v. Walling*, 324 U.S. 490, 65 S.Ct. 807, 89 L.Ed. 1095 (1945).

While neither counsel nor myself have been able to find any cases covering this precise question, there are numerous cases that define "establishment" as it applies to other sections of the Act. The cases make it clear that an analysis of the facts is the first step in determining any establishment issue. The observation of the court in *Gilreath v. Daniel Funeral Home, Inc.*, 421 F.2d 504, 508 (8th Cir. 1970), is pertinent here:

. . . and the critical factor in each case has been the integrity of the economic, physical, and functional separation between the business units.

## THE FACTS

All of the relevant facts, and some not so relevant, have been stipulated. The following factual determination is based largely on the stipulation plus uncontroverted testimony at the trial.

The New Hampshire Jockey Club, Inc. (Jockey) was incorporated in the State of New Hampshire on March 12, 1936. The New Hampshire Trotting and Breeding Association, Inc. (Trotting) was incorporated in the State of New Hampshire on February 11, 1957.

Jockey owns the land and buildings known as Rockingham Park in Salem, New Hampshire. Exhibit 5.

Jockey conducts thoroughbred racing at which parimutuel betting is conducted at Rockingham Park under a license issued by the New Hampshire Horse Racing Commission.

Trotting conducts harness racing at which parimutuel betting is conducted at Rockingham Park under a license issued by the State of New Hampshire Horse Racing Commission.

Trotting has a lease arrangement with Jockey for use of Rockingham Park for the purpose of conducting harness racing and for no other purpose without the prior written consent of Jockey. Exhibits 3 and 4. Trotting leased the premises during all periods it was licensed by the State to conduct meets, together with a minimum of fourteen days immediately before and fourteen days immediately after the first and last scheduled racing days of each meet.

The race track used for thoroughbred racing is a one mile sandy loam track. The race track used for harness racing is a half mile track having a clay base and a stone dust surface. The tracks are different except for an overlapping common home

stretch, the base and surface of which is changed for the two kinds of racing.

Jockey and Trotting both use essentially the same facilities at Rockingham Park, including the parking lots, grandstand, clubhouse, administration building, stable and barn areas, subject to certain exceptions and differences not material.

The salient features of the corporate structure of each defendant is important. Jockey has 100,000 shares of stock issued and outstanding. Trotting has 249,000 shares of stock issued and outstanding. The principal stockholders of Jockey for purposes of this case are: Kenneth F. Graf, 3,125 shares; Kenneth F. Graf and Lutza Smith, Trustees, 14,349 shares; Halgra, Inc., a personal holding company owned and controlled by Kenneth F. Graf, 2,300 shares; Trotting, 3,570 shares; and the Sullivan family, 10,548 shares. The Sullivan family is related to Sullivan Brothers Printers who do the printing for Trotting and Jockey, as well as a number of other horse racing enterprises.

The principal stockholders of Trotting for purposes of this opinion are the New Hampshire Jockey Club with 50% of the stock (124,500 shares), and Sullivan Brothers Printers with 12,250 shares.

Both Jockey and Trotting have a voting trust agreement. Jockey's was participated in by 87.98% of the outstanding shares, and Trotting's participation was 96.46% of the outstanding shares. The voting trustees for Jockey are Kenneth F. Graf, Arthur A. Greene, Jr., and William L. Phinney. Greene is a law partner of Graf. The voting trustees for Trotting are Kenneth F. Graf, Thomas M. Joyce, and William L. Phinney.

Kenneth F. Graf is President and Chairman of the Board of Jockey. He is also president of Trotting. None of the other officers of Jockey and Trotting are interlocked. Jockey has eight directors and Trotting has seven. Three of the directors of Jockey also serve as directors for Trotting: Kenneth F. Graf, Thomas M. Joyce, and William L. Phinney.

The total number of employees of Jockey in 1973 was 679, and in 1974 was 588. The total number of employees of Trotting for the same years was 644 and 504. The number of individuals who appeared on the payrolls of both Jockey and Trotting at one time or another, but not necessarily at the same time, in 1973 was 394, and in 1974 was 397. It has been agreed that the only employees implicated are those in Department 1042–Police, and Department 1004–Security.

The plaintiff alleges that 58 employees have been underpaid in the amount of $22,226.79.

Jockey and Trotting contract separately with Special Agent Consultants, Incorporated (SAC) for providing security and investigative services. As part of the services it provides, SAC screens applicants for employment and recommends to Jockey and Trotting those applicants qualified to be hired for security and police during the meets. Jockey and Trotting have the final say as to which applicants will be hired, and they may fire any of its employees at any time. At the end of the thoroughbred race meet and the harness racing meet, these employees are laid off. The defendants are in charge of assignment and supervision of security and police employees. There is no question that both Jockey and Trotting are employers of the security and police employees within the meaning of the Act.

During 1973, Jockey had 80 racing days (June 16—September 20) and in 1974, 73 racing days (June 29—September 22). In 1973, Trotting had 155 racing days (January 5—May 7 and October 4—December 1), and in 1974 had 155 racing days (January 3—May 6 and October 2—November 3). Trotting conducts its harness racing at night and Jockey's racing is in the daytime.

The average daily handle (the total amount of dollars wagered each day on races) for thoroughbred racing in 1973 was $705,823 and in 1974, $736,384. The average daily handle for harness racing in 1973 was $347,461 and in 1974, $304,213. The average daily attendance for thoroughbred racing in 1973 and 1974 was about 8,400,

and the average attendance for harness racing in both years was about 5,000.

Different breeds of horses are used for the two kinds of racing, and the jockeys who ride the thoroughbreds do not participate as harness drivers in harness racing. The New Hampshire Racing Commission has different rules for thoroughbred and harness racing, and the particular individuals in charge of each kind of racing for the State are entirely different.

Jockey and Trotting have different Federal Employer Identification numbers, they file separate Federal and State Corporation Tax returns, they maintain separate time and payroll records, they have separate checking, savings and other bank accounts, they have separate detail financial records, including separate records of income and expenses, and they issue separate financial statements and balance sheets.

It is clear that Jockey and Trotting are separate business organizations and each is engaged in a different but related business activity. It is also clear that Trotting operates only at the sufferance of Jockey. It is in no position to pull up stakes at the termination of the lease and go elsewhere. Because of the interlocking directors, officer and ownership by Jockey of 50% of the stock of Trotting, I find that Jockey effectively controls Trotting's operation. Jockey is not only Trotting's landlord; it has a definite say in how Trotting conducts its business.

### THE LAW

Although there is no definition of "establishment" in the Act, it has been defined to mean a distinct physical place of business, and this definition has received wide judicial acceptance. *Phillips, Inc. v. Walling, supra,* 324 U.S. at 495–96, 65 S.Ct. 807; *Mitchell v. Gammill,* 245 F.2d 207, 211 (5th Cir. 1957); *Wirtz v. Savannah Bank & Trust Company of Savannah,* 362 F.2d 857, 863 (5th Cir. 1966).

The Department of Labor has adopted this definition in its regulations.

As used in the Act, the term "establishment", which is not specially defined therein, refers to a "distinct physical place of business" rather than to "an entire business or enterprise" which may include several separate places of business. This is consistent with the meaning of the term as it is normally used in business and in government, is judicially settled, and has been recognized in the Congress in the course of enactment of amendatory legislation. 29 C.F.R. § 779.-23.

■ But the fact that both defendants operate from the same premises does not necessarily mean that they comprise one "establishment" for purposes of the Act. In *Gilreath v. Daniel Funeral Home, Inc., supra,* 421 F.2d at 509, the Court held that separate establishments could be operated on the same premises. *See also Wirtz v. Modern Builders, Inc.,* 288 F.Supp. 338 (M.D.Ga.1968). The Department of Labor has recognized in promulgating its regulations that this can be so.

Although, as stated in the preceding section, two or more departments of a business may constitute a single establishment, two or more physically separated portions of a business though located on the same premises, and even under the same roof in some circumstances may constitute more than one establishment for purposes of exemptions. In order to effect such a result physical separation is a prerequisite. In addition, the physically separated portions of the business also must be engaged in operations which are functionally separated from each other. 29 C.F.R. § 779.305.

Here, we have a physical separation because each corporation holds its races at different times, and there is no question but that the operations are functionally separated from each other. The case of *Brennan v. Yellowstone Park Lines, Inc.,* 478 F.2d 285 (10th Cir.), *cert. denied,* 414 U.S. 909, 94 S.Ct. 228, 38 L.Ed.2d 147 (1973), illustrates that one corporation can do business as separate and distinct establishments.

The plaintiff urges that cases involving maintenance employees of a business enter-

prise that owns a building which it partially leases and partially uses for its own business are analogous to the situation here. In *Montalvo v. Tower Life Building,* 426 F.2d 1135, 1145 (5th Cir. 1970), the Court held:

When business activities of a single enterprise take place within a single distinct physical place of business, for purposes of coverage under the Fair Labor Standards Act the employer should not be allowed to escape coverage for some of the employees involved by arguing that its business activities are separated into separate "establishments" along functional lines. To hold otherwise would be to frustrate the Congressional intent underlying the adoption of "enterprise" coverage, i. e., to eliminate situations in which some employees in an establishment of a large enterprise have the protection of the Act while others do not. In the light of these considerations, we conclude that the district court was eminently correct in finding that the enterprise here involved was a "single establishment enterprise."

To the same effect, *see Wirtz v. Columbian Mutual Life Insurance Company,* 380 F.2d 903 (6th Cir. 1967).

It is to be noted that, with the exception of *Yellowstone, supra,* none of the cases cited were concerned with the seasonal recreational or amusement exemption. Most of the cases construing establishments involved either retail employees or maintenance employees. The one strong thread running consistently through the great majority of these cases is that the courts have construed "establishment" so as to preclude application of the exemption. The regulations of the Labor Department, 29 C.F.R. §§ 779.23, 779.24, 779.303, 779.304, 779.305, and 779.306, show clearly that the Department defines "establishment" so as to use it as a tool to obtain coverage and limit the exemption.

In order to focus properly on the problem of this case, it is necessary to ignore the semantics involved in the use of the word "establishment" and concentrate on the basic question: whether these defendants are to be treated as a single employing unit.

From the standpoint of records, taxes and control over employees, the defendants here are two separate employers. But I cannot overlook the fact that Jockey effectively controls Trotting; it owns 50% of its stock, it determines by the voting trust through Kenneth Graf how the stock will be voted, and it has interlocking officer and directors. Jockey is, in effect, running a year round enterprise consisting of thoroughbred and harness racing. The word "enterprise" is defined in the Act:

"Enterprise" means the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units including departments of an establishment operated through leasing arrangements, but shall not include the related activities performed for such enterprise by an independent contractor; . . . . 29 U.S.C. § 203(r) (Supp.1976).

Instead of Jockey's premises lying idle for a good part of the year, they are rented to a corporation over which Jockey has effective control. The common business purpose is the use of Rockingham Park for horse racing for about two-thirds of each year.

■■ The reason for the exemption is obvious. It is to allow a seasonal amusement or recreational business to escape the burden of paying the relatively high minimum wages required by the Act. *Brennan v. Yellowstone Park Lines, Inc., supra.* It is equally obvious that the reason and purpose of the exemption do not apply to this factual situation.

I rule that the defendants are one "establishment" for purposes of the Act.

### THE RECEIPTS ISSUE

■ The next issue is whether the defendants, treated as a single establishment, meet the receipts test of the exemption. Under 29 U.S.C. § 213(a)(3)(B), the overtime provisions of the Act do not apply to

any employee of an establishment if "during the preceding calendar year, its average receipts for any six months of such year were not more that 33⅓ per centum of its average receipts for the other six months of such year."

Based on the affidavit of Nathanael F. Bigelow and his testimony at the trial, it is clear that the average receipts from *admissions* for the years 1972 and 1973 fall well within the one-third limitation. The question is not as to the percentage comparison, but whether receipts limited to admission payments only meet the test. Clearly, it does not. In addition to receipts from admissions, the defendants also obtain receipts from food and concessions, a small amount from parking fees and, most significant of all, a portion of the parimutuel wagers. Defendants concede, at least implicitly, that, if these receipts are included, the one-third comparison test cannot be met. Since the word "receipts" is not defined either in the Act or the regulations, defendants rely on an opinion letter from the Wage and Hour Administrator for limiting receipts to admissions. The letter was written in response to an inquiry relative to a municipally operated swimming facility open nearly twelve months of the year. It stated, *inter alia*, that "receipts" are fees received from admissions, but then went on to point out that such a facility whose operating costs are met wholly or primarily from tax funds would fail to meet the test. Opinion Letter No. 1359 WH–307, February 14, 1975. Defendants' reliance on this letter is like entering a rocking horse in the main race and betting on it to win. The attempt to restrict "receipts" to paid admissions and ignore the main source of defendants' income fails.

I rule that "receipts" in the exemption section of the Act means income from all sources. It follows, therefore, that the "receipts" exemption does not apply.

### THE GOOD FAITH DEFENSE

■ The defendants also rely on the good faith exemption contained in the Portal-to-Portal Pay Act, 29 U.S.C. § 259.

(a) In any action or proceeding based on any act or omission on or after May 14, 1947, no employer shall be subject to any liability or punishment for or on account of the failure of the employer to pay minimum wages or overtime compensation under the Fair Labor Standards Act of 1938, as amended, the Walsh-Healey Act, or the Bacon-Davis Act, if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation, of the agency of the United States specified in subsection (b) of this section, or any administrative practice or enforcement policy of such agency with respect to the class of employers to which he belonged. Such a defense, if established, shall be a bar to the action or proceeding, notwithstanding that after such act or omission, such administrative regulation, order, ruling, approval, interpretation, practice, or enforcement policy is modified or rescinded or is determined by judicial authority to be invalid or of no legal effect. 29 U.S.C. § 259(a).

The defendants' position as to the good faith defense is based primarily on the fact that in 1966 the Secretary of Labor dropped threatened litigation against the defendants and failed to appeal an adverse decision of a case involving the same issues but with another race track.

In 1965 or 1966, the then Secretary of Labor instituted suit against the Freehold Racing Association which operated a race track in Monmouth, New Jersey, for a sixty day season alleging overtime violations. The defendant, Freehold, claimed that it was exempt under Section 1382 of the 1966 Act which provided in pertinent part that an employee of an amusement or recreational establishment operating on a seasonable basis shall not be subject to the overtime provisions of the Act. The Secretary took the position that defendant's business was not retail or service, not recreational and not seasonal. The decision was adverse to the Secretary on all three points. *Wirtz*

*v. Freehold Racing Association*, 53 C.C.H. Labor Cases ¶ 31,786 (D.N.J.1966). An appeal initiated by the Secretary was dropped.

The provision of the Act that Freehold successfully relied upon was abolished in 1966 and reenacted in its present form. While there is no evidence to this effect, it may fairly be inferred that the *Freehold* decision played some part in the wording of the present provision of the Act.

As with other sections of the Act, the good faith defense provisions have been strictly construed. In *Fred Wolferman, Inc. v. Gustafson*, 169 F.2d 759, 764 (8th Cir. 1948), it was held that the dismissal by the administrator of an appeal did not constitute "an administrative interpretation." *Hodgson v. Royal Crown Bottling Company, Inc.*, 465 F.2d 473, 476 (5th Cir. 1972), cites *Wolferman* for its holding that voluntary dismissal of appeal is not an administrative ruling. The applicable law is set forth in *King v. Board of Education of City of Chicago*, 435 F.2d 295, 297 (7th Cir.), *cert. denied*, 402 U.S. 908, 91 S.Ct. 1380, 28 L.Ed.2d 649 (1970).

> Section 10(a), however, requires more than good faith conduct; to be relieved of paying overtime under the Act there must be good faith reliance upon a written administrative order, etc.

While I am of the opinion that the defendants acted in good faith, as the term is commonly understood, it is clear that, because of the case law interpretation given to the words "good faith," the defense of good faith is not available to the defendants.

## WILLFUL VIOLATION

■ The final question is whether the two or three year statute of limitations applies, and this depends upon whether or not there has been a willful violation of the Act. 29 U.S.C. § 255(a) provides:

> (a) if the cause of action accrues on or after May 14, 1947—may be commenced within two years after the cause of action accrued, and every such action shall be forever barred unless commenced within two years after the cause of action ac-

crued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued;

Here again, the defendants are faced with a definition that is slanted in favor of the Government.

In *Coleman v. Jiffy June Farms, Inc.*, 458 F.2d 1139, 1142 (5th Cir.), *cert. denied*, 409 U.S. 948, 93 S.Ct. 292, 24 L.Ed.2d 219 (1972), the Court interpreted "willful violation" as follows:

> The entire legislative history of the 1966 amendments of the FLSA indicates a liberalizing intention on the part of Congress. Requiring employers to have more than awareness of the possible applicability of the FLSA would be inconsistent with that intent. Consequently, we hold that employer's decision to change his employees' rate of pay in violation of FLSA is "wilful" when, as in this case, there is substantial evidence in the record to support a finding that the employer knew or suspected that his actions might violate the FLSA. Stated most simply, we think the test should be: Did the employer know the FLSA was in the picture? . . .

And the broad sweep of this definition was enlarged in *Brennan v. Heard*, 491 F.2d 1, 3 (5th Cir. 1974):

> Those cases establish that neither a good faith belief in the lawfulness of his wage and overtime regulations nor complete ignorance of their invalidity shields the employer from the additional year of liability. Such nescience and naivete are not determinative on the question of willfulness under this Act. An employer acts willfully and subjects himself to the three year liability provision if he knows, or has reason to know, that his conduct is *governed by* the Fair Labor Standards Act. (Emphasis in original.)

In the instant case, the defendants were aware of the Act, at least at the time of the *Freehold* case, and they knew in 1973 and 1974 of the amendment to the Act.

This knowledge makes the defendants' failure to pay overtime at the rate of time

and one-half a willful violation of the Act and the three year statute of limitations applies.

Judgment will be entered for the plaintiff.

No costs.

The Clerk will set a date for a hearing on the accounting issue.

SO ORDERED.