F. Ray MARSHALL, etc., Plaintiff,
Appellee,

v.

The NEW HAMPSHIRE JOCKEY
CLUB, INC., et al., Defendants,
Appellants.

No. 77–1037.

United States Court of Appeals,
First Circuit.

Argued May 2, 1977.

Decided Sept. 9, 1977.

Jack B. Middleton, Manchester, N. H., with whom Richard S. Snierson and McLane, Graf, Greene, Raulerson & Middleton, Professional Association, Manchester, N. H., were on brief, for appellants.

John K. Light, Jr., Washington, D. C., with whom Carin Ann Clauss, Sol. of Labor, Carl W. Gerig, Jr., Acting Associate Sol., Washington, D. C., Albert H. Ross, Regional Sol., Boston, Mass., and Jacob I. Karro, Washington, D. C., were on brief, for appellee.

Before COFFIN, Chief Judge, CAMPBELL, Circuit Judge, DOOLING, District Judge.*

LEVIN H. CAMPBELL, Circuit Judge.

In this appeal from a district court decision favorable to the Secretary of Labor,[1] appellants assert that in 1973 and 1974 they were both exempt from the overtime provisions of the Fair Labor Standards Act (the "Act") by virtue of section 13(a)(3) which exempts,

> "any employee employed by an establishment which is an amusement or recreational establishment, if (A) it does not

---

* Of the Eastern District of New York, sitting by designation.

1. The opinion of the district court appears at 420 F.Supp. 416 (D.N.H.1976).

operate for more than seven months in any calendar year, or (B) during the preceding calendar year, its average receipts for any six months of such year were not more than 33⅓ per centum of its average receipts for the other six months of such year . . . ."

29 U.S.C. § 213(a)(3).

One of the appellants, The New Hampshire Jockey Club, Inc. (Jockey), owns Rockingham Park in Salem, New Hampshire, where it conducts thoroughbred flat racing during the summer months. The other appellant, New Hampshire Trotting and Breeding Association, Inc. (Trotting), rents portions of Rockingham Park from Jockey during the spring and fall to conduct harness races. Both companies employ many of the same individuals as security guards during their respective seasons; the overtime wages of these common employees are in issue. The question on appeal is whether the district court was correct in ruling that Jockey and Trotting were a single "establishment" within section 13(a)(3) during the relevant period, 1973 and 1974. If so neither was then exempt, since their combined operations extended over more than seven months, and their combined average receipts were not distributed in those two years so as to meet part (B) of the exemption.[2]

I.

We state the facts, which are undisputed, in some detail. Jockey was organized in 1936 to take over thoroughbred racing at Rockingham from a prior operator. In 1957 various persons contemplated opening a harness racing track in Massachusetts, which would have competed with Rockingham. These persons, represented by a Boston attorney, contacted representatives of Jockey to explore the possibility of running harness races at Rockingham. Negotiations culminated in the organization of Trotting,

a separate corporation, and the signing of a lease agreement between the two companies. Jockey obtained a fifty percent participation in Trotting at the time of its creation. Members of the Sullivan family, who collectively owned approximately ten percent of Jockey's stock, obtained a five percent interest in Trotting. The Sullivan firm provides printing services to race tracks on the East Coast and has investments in numerous tracks. No other common ownership of Jockey and Trotting exists.

During 1973 and 1974, the years in question, Jockey's season ran from June 16 until September 22 and June 29 until September 22. In 1973 Trotting ran races from January 5 to May 7 and October 4 to December 1. The following year Trotting operated from January 3 to May 6 and October 2 to November 30. Jockey conducts thoroughbred races on a one mile oval track with a sandy loam surface. The harness races run by Trotting take place on a half-mile oval track interior to that used by Jockey but contiguous along the eighth-mile homestretch facing the grandstand. Because harness racing requires a track surface of clay and stone dust, Jockey must dig up the homestretch at the beginning and end of its season and make alterations, for which Trotting pays. Because of the different surfaces, the remainder of the respective tracks can be used only by the one sport.

The thoroughbred racing conducted by Jockey and the harness races conducted by Trotting differ in other respects. A different breed of horse and different horsemen participate in each kind of race. Thoroughbred races take place during the day, harness races at night. Separate licenses are required by the State of New Hampshire. Control of thoroughbred races is in the hands of three stewards approved by the State of New Hampshire Horse Racing

---

2. The Secretary concedes that Jockey and Trotting met the receipts part of the exemption, 29 U.S.C. § 213(a)(3)(B), in the two subsequent years, 1975 and 1976, even if viewed together as one "establishment"; hence their exemption in those years from the overtime requirements

of the Act is undisputed. If Jockey and Trotting constitute separate establishments, the Secretary also concedes that the exemption would apply to them during 1973 and 1974. 420 F.Supp. at 418.

Commission. Three judges approved by the Commission run the harness races. Stewards and judges are completely separate individuals who operate under different systems of rules and regulations.

The economics of the two forms of racing also differ significantly. The average daily total of wagers for thoroughbred racing at Rockingham was $705,823 in 1973 and $736,384 in 1974. Average daily attendance for the two years was 8,394 and 8,664, and the average wager per customer was $84.09 and $84.99 respectively. For harness racing, the average daily total of wages was $347,461 and $304,213, the average daily attendance was 5,194 and 4,431, and the average daily wager per person was $66.90 and $68.66. New Hampshire collects different commissions on wagers and levies different taxes for the two sports.

Although different tracks are used, there is a substantial overlap in the facilities employed by the two companies. Both use the same grandstand, clubhouse, administrative building, parking lots, barns and stable areas, although Trotting's administrative offices are arranged somewhat differently. Because of the relatively smaller scale of harness racing at Rockingham, however, Trotting uses less of the parking facilities and fewer stables and barns. Jockey operates a cafeteria during its season, while Trotting maintains only a lunch counter. The harness racing drivers use different facilities than the thoroughbred racing jockeys enjoy. Trotting installs lights and poles and removes them at the end of its season. Different paddocks are used in the two forms of racing.

During 1973 and 1974, substantial overlap also existed in the employment practices of the two companies. Jockey employed 679 persons in 1973 and 588 in 1974; Trotting employed 644 and 504 respectively. Of these employees, 394 appeared on both companies' payrolls in 1973 and 397 in 1974. Most of those employed by both were laid off at the end of one season and hired at the start of the succeeding season by the other company, but without any automatic right of continuous employment. Most of

the employees of the two companies are unionized, and the unions have separate contracts and seniority rosters with the companies. Fourteen clerical or support workers were employed throughout the year by either Jockey or Trotting, and Jockey maintained one painter on its payroll continuously through 1973 and 1974. In addition, certain key administrative employees, including the Stall Superintendent, Director of Mutuels, Director of Publicity, Director of Admissions and Track Veterinarian each worked for both companies during this period.

The fifty-eight persons whose overtime wages are at issue in this suit were hired through separate contracts with Special Agents Consultants, Inc., to provide security at Rockingham during the different seasons. Jockey and Trotting each had final authority to hire and fire the applicants recommended to it by Special Agents. These particular employees were not unionized.

The district court found as a matter of fact that "Jockey effectively controls Trotting's operation." 420 F.Supp. at 420. This conclusion is supported. Jockey shareholders participate in a voting trust agreement, dated as of February 15, 1965, which controls eighty-eight percent of its outstanding shares. Trotting shareholders participate in another voting trust agreement, dated as of August 17, 1970, which controls ninety-six percent of its stock. Each trust has three trustees, two of whom are the same. All of Trotting's trustees are Jockey directors. Pursuant to the Trotting voting trust, one trustee is appointed by Jockey, one by non-Jockey interests, and one by the two other trustees. The "neutral" trustee appointed by the others is Kenneth F. Graf, President and Chairman of the Board of Jockey and the person who represented Jockey in its original negotiations with Trotting concerning the lease. Until October 1973 four of Jockey's seven directors also served on Trotting's six-man board. After that date three of Jockey's six directors sat on Trotting's five-man board. Graf, the president of Jockey, also was

president of Trotting, and his assistant at Jockey was director of operations for Trotting. The secretary of each corporation was the same person, and one of Trotting's two vice-president was a Jockey director.

Despite Jockey's substantial control, however, significant aspects of the relationship between the two companies are governed by the lease of Rockingham they have signed. These aspects include Trotting's basic right of access to Rockingham, the cost of this right, and the distribution of the costs of maintenance between the two parties. The lease does not contain any provision permitting Jockey unilaterally to escape its obligations. Trotting has a series of options to renew the lease on the same terms until 1993.

Jockey and Trotting have scrupulously maintained their separate corporate identities. The companies file separate reports with New Hampshire regulatory authorities; maintain separate insurance policies with some variations in coverage; contract separately with suppliers of services and materials; file separate tax returns; maintain separate time and payroll records; maintain separate financial records; and hire separate bookkeepers. Some of this separation is made necessary by the fact that Jockey is regulated by the SEC but Trotting is not. Both Jockey and Trotting use time sheets printed by the Sullivan firm that are labeled only "Rockingham Park", but permanent records are made on sheets that separately identify the companies. Secretaries at the track answer the phone "Rockingham Park"; the companies do not maintain separate telephones.

## II.

Application of the § 13(a)(3) exemption in these circumstances is, to put it mildly, not self-evident. The Fifth Circuit has said, "If there is any unifying principle underlying the exemptions in the FLSA, it is not evident in the Act's words or its legislative history. Reading the Act's legislative history and its exemptions leads one to conclude that the exemptions were created simply to ensure the Act's passage."

*Brennan v. Texas City Dike & Marina, Inc.,* 492 F.2d 1115, 1117 (5th Cir.), *cert. denied,* 419 U.S. 896, 95 S.Ct. 175, 42 L.Ed.2d 140 (1973).

■ Section 13(a)(3) emerged in its current form in 1966, when the Act was being extended to occupations previously exempt. During debate, Rep. O'Neil asked Rep. Dent, floor manager of the bill,

"Does this retain the existing exemption for amusement or recreational establishments, such as amusement parks, sports events, parimutuel racing, sport boating or fishing and similar activities, so long as such establishments meet one of the seasonal definitions set out  .  .  . ?"

Congressman Dent confirmed this interpretation. 112 Cong.Rec. 10757 (1966). Previously the employees of "an amusement or recreational establishment that operates on a seasonal basis" were exempt only if the establishment was also a "retail or service establishment" more than 50 per centum of the sales of which were within the state where the establishment was located. 29 U.S.C. § 213(a)(2)(ii). When the 1966 amendments were pending, a court held that a pari-mutuel harness race track satisfied the "retail or service establishment" portion of the exemption. *Wirtz v. Freehold Racing Association,* 53 CCH Lab.Cas. ¶ 31,786 (D.N.J.1966). The current wording seems to have been intended to establish criteria for seasonality, and—by eliminating the "retail and service" language—to make plain that employees of seasonal amusement or recreational companies generally are exempt.

The question remains of how to apply the exemption to two separate corporations under common ownership which utilize the same facilities at different seasons for related but separate sports and who employ many of the same individuals as employees. Where each by itself would qualify, should each be exempt, or should the two be treated together, as a single "establishment"?

■ In deciding that the two were one establishment, the district court laid heavy

stress upon the factor of common ownership and control. But both the Secretary of Labor's regulations and the case law indicate that ownership and control are not dispositive in determining whether or not an "establishment" is single or multiple. *See* 29 C.F.R. § 779.303–.305. "Establishment" as used in another FLSA exemption was early held to mean a "distinct physical place of business", such as a retail store, rather than the entire business unit to which it may belong. *Phillips, Inc. v. Walling*, 324 U.S. 490, 65 S.Ct. 807, 89 L.Ed. 1095 (1945). Separate stores under common ownership may each be establishments while other aspects of the total operations of the same company may be found to be outside the pertinent establishment. *See Mitchell v. Bekins Van & Storage Co.*, 352 U.S. 1027, 77 S.Ct. 593, 1 L.Ed. 589 (1957), *summarily rev'g* 231 F.2d 25 (9th Cir. 1956). Conversely, different ownership does not prevent closely integrated departments from being treated as a single establishment, *e. g.* separately owned departments in a department store may belong to one establishment. 29 C.F.R. § 779.304. We believe the law to have been correctly summarized as follows:

> "[S]imply because two business operations have a common ownership and there is a close economic relationship between these separate units, is not sufficient to make the units a single establishment within the meaning of the Act."

*Wirtz v. Modern Builders, Inc.*, 288 F.Supp. 338 (M.D.Ga.1968). *See also Reid v. Teutonia Wine and Liquor Mart, Inc.*, 392 F.Supp. 904 (E.D.Wis.1975).

■ The Secretary of Labor has promulgated regulations which, while not altogether in point here, at least suggest a proper approach. These set out criteria for determining when portions of the same business located on the same premises constitute more than one establishment. The Regulations provide, in part,

> Although . . . two or more departments of a business may constitute a single establishment, two or more physically separated portions of a business though located on the same premises, and even under the same roof in some circumstances may constitute more than one establishment for purposes of the exemptions. In order to effect such a result physical separation is a prerequisite. In addition, the physically separated portions of the business also must be engaged in operations which are functionally separated from each other. . . . In other words, [one] portion of an establishment would be considered a separate establishment from the unrelated portion for the purpose of the exemption if (a) it is physically separated from the other activities; and (b) it is functionally operated as a separate unit having separate records, and separate bookkeeping; and (c) there is no interchange of employees between the units. The requirement that there be no interchange of employees between the units does not mean that an employee of one unit may not occasionally, when circumstances require it, render some help in the other units or that one employee of one unit may not be transferred to work in the other unit. The requirement has reference to the indiscriminate use of the employee in both units without regard to the segregated functions of such units.

29 C.F.R. § 779.305.

■ This form of analysis was adopted by the Eighth Circuit in *Gilreath v. Daniel Funeral Home, Inc.*, 421 F.2d 504 (8th Cir. 1970), in determining whether a funeral home and a related funeral insurance company, both located in the same building, were separate establishments. The court observed, after reviewing the case law, "[T]he critical factor in each case has been the integrity of the economic, physical and functional separation between the business units." *Id.* at 508. *See also Acme Car & Truck Rentals, Inc. v. Hooper*, 331 F.2d 442 (5th Cir. 1964); *Brennan v. Clark*, 22 W.H. Cases 655 (E.D.Va.1975). We believe that a multi-faceted approach aimed at determining the integrity of separation between business units is in order here in contrast to single-minded reliance upon any one factor

such as control, ownership or "physical location".[3]

Looking first at the tests in Section 779.305 of the Secretary's regulation, we note that the district court found "physical separation" to exist, apparently because each business used the same facilities at a different season, with no overlap. Temporal separation provided, in effect, for physical separation. Absent any reason to suppose that Congress wished to penalize two otherwise separate seasonal establishments merely because at different moments they used the same facilities, we think appellants do, in substance, meet any applicable "separation" criterion. We add that, for reasons indicated in footnote 3, *supra*, we doubt that physical separation is as key a factor in applying an exemption based on seasonality as it may be in other situations.

Section 779.305 of the Secretary's regulation goes on to call for "functional" separation and "no interchange of employees between units". The former test is clearly met, the district court having found, "there is no question but that operations are functionally separated from each other". 420 F.Supp. at 420. Each company maintains separate records, receives different tax treatment, and exercises independent hiring decisions with respect to employees.

The "no interchange of employees" criterion seems also to be met even though many of the same individuals are employed at different seasons by both businesses. Each business hires those employees it needs, and, with only the most minor exceptions, there is no simultaneous sharing of the same employees. Neither concern has any obligation to hire or use the other's employees.

While it is possible thus to conclude that both companies pass the three tests set out in the Secretary's regulation, we hesitate to stop there, as two of the three tests are not framed in terms that take account of the kind of seasonal pooling of facilities and employees that exists here, nor was the regulation framed with this exemption in mind. Instead, we think it appropriate to proceed beyond the regulation and look more broadly into "the integrity of the economic . . . and functional separation between the business units".[4] *Gilreath v. Daniel Funeral Home, Inc., supra.* These factors (more than physical separation, see above) seem to us critical in applying the § 13(a)(3) exemption.

3. *Compare Montalvo v. Tower Life Building*, 426 F.2d 1135 (5th Cir. 1970); *Wirtz v. Columbia Mutual Life Insurance Co.*, 380 F.2d 903 (6th Cir. 1967); *Wirtz v. Savannah Bank & Trust Co.*, 362 F.2d 857 (5th Cir. 1966), *with Hodgson v. Crotty Brothers Dallas, Inc.*, 450 F.2d 1268 (5th Cir. 1971); *Wirtz v. Campus Chefs, Inc.*, 303 F.Supp. 1112 (N.D.Ga.1968). While "physical location" may be relevant in applying an exemption depending on the nature of a particular business (such as whether the employer is a retail sales company), it has little to do with an exemption based on the periods in which a business operates. A common place of business alone is particularly inapposite to application of an exemption based on seasonality, as two seasonal businesses may, by operating at different times, utilize the same location while retaining their independence. Such a test in effect begs the question, because the possibility remains that the two businesses, being independently seasonal, are able to retain their separate identities notwithstanding common use of the single facility.

4. The § 13(a)(3) exemption turns on the nature of the employer's business, not on the nature of the employee's work. We thus do not agree, in the present context, with the broad statement found in one court's decision, "The nature of the work is what gives rise to the need for an exemption; the exemption is not a subsidy accorded to an employer because of his principal activities." *Brennan v. Six Flags Over Georgia, Ltd.*, 474 F.2d 18, 19 (5th Cir.), *cert. denied*, 414 U.S. 827, 94 S.Ct. 47, 38 L.Ed.2d 61 (1973). The exemption in § 13(a)(3) is very much framed in terms of the employer's business, not the work performed. It is irrelevant that a security guard separately employed at Rockingham Park first by Jockey and then by Trotting might see his own employment as more or less continuous and the same for more than seven months. The guard's position is analogous to that of a retail clerk, whose exemption under § 13(a)(2) depends upon whether his employer's gross sales exceed $1,000,000. *See* 29 U.S.C. § 213(a)(2). From the standpoint of both employees, the existence or non-existence of exemption is entirely fortuitous, having little or nothing to do with the character of their own work.

In stating earlier that the district court should not have ended its analysis with a finding that the two companies had a common ownership and control, we pointed out that different establishments may be owned by a single owner and have a common business purpose. The more important consideration in terms of this particular exemption would seem to be the degree of actual economic independence of the two business units. To the degree that thoroughbred racing and harness racing are separate businesses involving different seasons, different business risks and different patterns of state regulation, each is independent of the other economically and each merits the exemption designed for it.

Jockey and Trotting each depends for its primary source of income on admission charges and pari-mutuel wagering. Both the different nature of the two sports and the different schedules they follow create markedly different attendance and betting patterns. Furthermore, each sport is subject to a different but extensive system of state regulation. Actual control of the races lies in the hands of stewards or judges who apply different sets of rules and regulations. The state's share of gambling revenues and imposition of taxes differ between the two sports.

Weighed against these distinguishing economic factors is the fact of common control of the two companies. Operating control is not irrelevant to an inquiry into economic independence, as common management may lead to patterns of cooperation, accommodation and interdependence that may justify treating two operations as a single business. Nor is it irrelevant that both companies are able to share the facilities of Rockingham Park, and, aided by the common situs, draw some employees from a common pool; these abilities doubtless reduce expenses and serve the convenience of both concerns. The circumstances of Trotting's creation suggest, moreover, that the two forms of racing are to a degree competitive with one another; coordination of the two enterprises presumably maximizes their revenues. Each company undoubtedly strives to create goodwill among its customers that redounds to the benefit of the other.

But while these benefits accruing from joint control are important to consider in assessing economic separation, they seem to us to be less than decisive. The exemption was designed for particular kinds of seasonal businesses, including pari-mutuel race tracks. There is no evidence that Congress meant to withhold this exemption from seasonal enterprises that in some way become associated with other businesses, including other seasonal businesses. The race track owner who also owns other businesses may be in a more secure economic position and therefore less in need of the benefits afforded by the exemption. The economic security of the owner, however, was not made a test for applying the exemption contained in § 13(a)(3). Instead the statute grants the exemption to each "establishment" that qualifies. Common control is only one factor involved in determining whether two companies are so interdependent economically as to require treatment as a single establishment.

Under the circumstances of this case, the benefits associated with common control do not seem sufficiently important to support a finding of economic unity of the two companies. Not only is there functional separation, but in addition, the amount of discretion the common management possesses to blend the operations of Jockey and Trotting is significantly limited by the regulatory powers of New Hampshire. The Horse Racing Commission closely supervises each sport separately and the State exercises substantial control over the profits of each company. The fact of common control therefore assumes less importance than it would have in a less extensively regulated business.

And finally we note the absence of any suggestion that the two companies were founded or maintained on a separate basis for spurious or sham reasons. Their history and the separate nature of the two sports support their *bona fides* as two valid, independent businesses.

Because Jockey and Trotting constitute different businesses, functionally and economically separate and physically distinguishable, we hold that each is entitled to separate treatment under § 13(a)(3). Because each company meets the criteria of that provision, each was exempt from the minimum wage and overtime provisions of the FLSA.

*Reversed.*