MARÍA J. CALDERÓN, Complainant and Appellee, *v.* ESSO STANDARD OIL CO. OF PUERTO RICO, Defendant and Appellant.

No. R-64-31.     Decided March 25, 1965.

*Beverley, Castro & Rodríguez Lebrón* for appellant. *Demetrio Fernández Quiñones, Manuel I. Medina Aymat,* and *Juan Hernández Valle* for appellee.

Division composed of Mr. Acting Chief Justice Pérez Pimentel, Mr. Justice Blanco Lugo, and Mr. Justice Ramírez Bages.

MR. JUSTICE RAMÍREZ BAGES delivered the opinion of the Court.

For the purposes of deciding, we must consider in this case whether or not María J. Calderón, appellee herein, was an executive of appellant, Esso Standard Oil Co. of Puerto Rico. There is no controversy as to the fact that appellee worked overtime for appellant, so that if she is not an executive of that enterprise, she is entitled to pay for such overtime and to recover the penalty prescribed by law.

Appellee claimed overtime pay for the following three periods in which her salary was as shown below:

| PERIODS | SALARIES |
|---|---|
| 1. From 8/10/59 to 5/31/60 | $400 a month |
| 2. From 6/1/60 to 11/30/61 | 440 a month |
| 3. From 12/1/61 to 8/12/62 | 480 a month |

The case having been heard, the trial court concluded:

"10. That during the period from August 10, 1959, to May 31, 1961 [*sic*], complainant worked two extra hours a day which were not paid her, as follows:

| PERIOD | EXTRA HOURS | SALARY | SINGLE RATE | DOUBLE RATE | TOTAL |
|--------|-------------|--------|-------------|-------------|-------|
| 8-10-59 to 5-31-60 | 504 in 42 weeks at 12 hours a week | $92.31 a week | $1.92 | $3.84 | $1,935.36 |

"7. During the period from August 10, 1959, to May 31, 1960, in which complainant earned a salary of $400 a month ($92.31 a week), she was neither a manager nor an executive, since she did not meet the requirements of Regulation No. 13 of the Minimum Wage Board, (1) *Morales* v. *Superior Court,* 84 P.R.R. 119 (1961); *Piñán* v. *Mayagüez Sugar Co.,* 84 P.R.R. 86 (1961); *Kaczanowski* v. *Home State Bank,* 77 F.Supp. 602 (D.C. Wis. 1948); the requirement on salary earned was lacking; and for the additional ground that in the light of the first part of the Regulation, she devoted during such period more than 20 percent of her time to activities which were not directly or closely related to her functions as an executive. (See Exhibit 29 of Defendant, where it appears that, according to the sheet describing the work performed, she devoted 24 percent to the operation of machines.)"[1]

---

[1] Regulation No. 13, which defines the term "executive," has been modified on several occasions. This Regulation was approved by the Secretary of Labor and promulgated on December 26, 1951. It was repealed and a revision thereof was promulgated on December 17, 1959, to be effective January 15, 1960 (29 R.&R.P.R. § 286). According to this Regulation, an executive is:

"(A) Any employee who meets the following requirements:

"(i) whose primary duty consists of the management of the enterprise in which he is employed or of a customarily recognized department or subdivision thereof;

"(ii) who customarily and regularly directs the work of two or more other employees therein or of such department or subdivision thereof;

"(iii) who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring and firing and

The court therefore sustained the complaint in this case and ordered appellant to pay to appellee the sum of $1,935.36 for overtime worked and not paid during the aforesaid first period plus an equal sum by way of penalty, plus the sum of $700 for attorney's fees. It denied the complaint as to the following two periods on the ground that:

"9. During the last two periods of time involved in the complaint, namely, from June 1, 1960 to November 1961, and from December 1, 1961 to August 12, 1962, when she ceased in defendant's employment, complainant received for her services a fixed compensation equivalent to a weekly salary of not less than One Hundred Dollars."

---

as to the advancement and promotion or any other change of status of other employees will be given special attention;

"(iv) who customarily and regularly exercises discretionary powers;

"(v) who does not devote over 20 percent of the number of hours worked in the workweek to activities not directly or intimately related to the performance of the work described in par. (A), subpars. (i) to (iv) of this subdivision; Provided, That this subpar. (v) shall not apply in the case of an employee who is in sole charge of an independent establishment or a physically separated branch establishment, or who owns at least a 20 percent interest of the enterprise he works for; and

"(vi) who is compensated for his services on a fixed basis (by day, week, fortnight or longer periods) equivalent to the weekly salary which results from multiplying by 60 the highest minimum rate per hour applicable by a law of the Commonwealth of Puerto Rico or by a mandatory decree of the Minimum Wage Board of Puerto Rico to the activities in connection with which he performs his duties as an executive, exclusive of board, lodging, or other facilities; Provided, however, That the weekly salary shall never be less than 35 dollars when said compensation computed in the manner already mentioned would result in or is less than this amount, or when there is no salary applicable by law or decree; or

"(B) (i) Any employee whose work complies with the requirements of par. (A) (i) and (ii) of this subdiv. (1); and

"(ii) who is compensated for his services on a fixed basis (by day, week, fortnight or longer periods) equivalent to a weekly salary of not less than 100 dollars, exclusive of board, lodging, or other facilities."

The text of Regulation No. 13, which was in force until January 15, 1960, provided in subd. (a) (6), equivalent to the former subd. (a) (vi), the following:

"(6) who is compensated for his services on a fixed basis (by day, week, fortnight or longer periods) equivalent to a weekly salary of not less than $30.00, exclusive of board, lodging, or other facilities; or . . . ."

During the first period in question, and according to the findings of fact of the trial court:

"2. The IBM Department was a recognized department or subdivision of defendant the personnel of which was regularly and permanently attached thereto, it being the function of that department to render services to the other departments of the company by the mechanized processing of data and information by IBM machines.

"3. Complainant's primary duty consisted in the management of that department or subdivision, and she devoted the greater part of her working time to management work such as: interviewing, selecting and training employees; recommending the fixing and adjustment of the compensation of subordinates; management of the work of the employees attached to the department supervised by complainant; keeping records of the work performed by her subordinates in order to facilitate supervision or control; evaluating the efficiency of her subordinates for the purpose of recommending promotions or changes in the status of such employees; calling attention and supervising the work of her subordinates; planning the work to be performed by the latter; assigning work to the employees under her direction; and controlling the inflow and type of materials, supplies, and equipment.

"4. Complainant habitually and regularly directed the work of the employees attached to defendant's IBM section, the number of which ranged from 8 to 10 during the periods of time comprised in the complaint.

"5. Complainant made suggestions and recommendations on the employment, dismissal, improvement, promotion, and change in the status of the employees attached to the IBM section, and her suggestions and recommendations on the matter received special attention of defendant's management.

"6. Complainant exercised, commonly and regularly, discretionary powers, particularly when interviewing, selecting, and training personnel, in making recommendations as to the fixing and adjustment of the latter's compensation, in directing the work of her subordinates, and in evaluating their efficiency for the purpose of recommending promotions and changes in status; in planning and supervising the work of her subordinates; and

in determining and controlling the inflow and type of materials, supplies, and equipment in the IBM section. Complainant also exercised discretion in determining when and which subordinate employees should work overtime; and in acting as counsellor and adviser in problems concerning the IBM operations and work.

"8. During all the time which she worked for defendant, complainant devoted more than 80 percent of her working time to activities directly and closely related to her management and supervisory functions, such as checking the requests for work sent to the IBM section and maintenance of control for the prompt performance of such work; maintenance of the production control in the IBM section, and inspection of the work performed by her subordinates in order to comply with the work schedule; checking the work performed in that section; serving as adviser on problems concerning the mechanization of the work through the IBM system; training new employees in the section; controlling the supply of materials and equipment; designing new codification forms; evaluating the personnel attached to the section and recommending promotions, increases and dismissals; studying the requests and needs for equipment for the purpose of recommending changes; supervising and checking the work of her subordinates in order to improve efficiency; and helping with the wiring of the IBM machines."[2]

We have no doubt that in the light of the doctrine established in *Morales, supra,* and *Piñán, supra,* appellee performed executive functions for appellant, the only question remaining for decision being whether compliance was had, during the said first period of her claim, with the requirement not to devote more than 20 percent of the hours worked to activities not directly or closely related (1) to the management of the IBM department, and (2) to the supervision of the work of two other or more employees of appellant or of the said department.

---

[2] Evidently the trial judge meant to say that appellee devoted less than 80 percent of her time to managerial functions, according to finding No. 7 copied at the outset of this opinion.

Feeling aggrieved, appellant filed the corresponding petition for review alleging the commission by the trial court of the following two errors:

"1. . . . the trial court erred in holding that during the period from August 10, 1959 to May 31, 1960, during which complainant earned a monthly salary of $400 (equivalent to $92.31 a week), she did not meet the requirements on salary earned of Regulation No. 13 of the Minimum Wage Board."

It was admitted that this error was committed because the minimum wage requirement in the classification of executive was $30 a week up to January 15, 1960, and $35 a week thereafter, and there is no question that during that period appellee received a salary of $400 a month, or about $92.31 a week. However, appellant further contends that appellee's salary during the first period in question actually complied with the special provisions of subd. (B) (i) and (ii) of the Regulation, since the amount of such salary exceeded $100 a week, the same consisting of the basic salary of $92.31 a week, in addition to a monthly contribution and another annual variable contribution paid for the benefit of appellee which amounted to about an additional $8.50 a week; that these additional payments were due, in part, to a savings plan which, jointly with the employee's contribution, was deposited in the Chase Manhattan Bank as trustee of the savings plan, and, in part, as a mere variable annual gift or bonus; that the trial court did not take this situation into consideration; that the regulation in question comprises "any kind of compensation paid for services," exclusive only and by express provision of the regulation of "board, lodging, and other similar facilities"; that these additional payments should be included for the purpose of determining the taxable income in cases such as that of appellee. Appellee contends, on the contrary, that this ground was not alleged in the petition for review in this case, as required by Rule 53.3 of the Rules of Civil Pro-

cedure, and, therefore, that the same should not be invoked and discussed after the writ of review is issued; that the contribution under the said plan does not constitute part of appellee's regular pay; that the doctrine established in *Phillips Co.* v. *Walling*, 324 U.S. 490 (1945),[3] requires that, in determining the salary for the purpose of excluding an employee from the benefit of additional pay for overtime work, there should be excluded the contribution in question which was not granted for services rendered but for the purpose of creating in the employees the habit of savings, on condition that the latter in turn save a certain percentage of their salary. Since we can dispose of the case by determining that the trial court committed the error discussed below, we need not consider this question.

"2. The trial court erred in holding, as additional ground of its judgment, that during the said first working period complainant devoted more than 20 percent of the work to activities not directly or closely related to her executive functions."

■ The trial court's conclusion to the effect that appellee devoted more than 20 percent of her monthly work to activities not directly or closely related to her executive functions is based on the fact that subdivision 10 of the sheet describing the work performed by her showed that she devoted 24 percent of her monthly working time to "help in

---

[3] In *Phillips, supra*, it was said that:

". . . Any exemption [or exclusion] from such humanitarian legislation [it refers to the Fair Labor Standards Act] must therefore be narrowly construed. . . . To extend an exemption to other than those plainly and unmistakably within its terms and spirit is to abuse the interpretative process and to frustrate the announced will of the people." We cited this doctrine in *Commissioner of Labor* v. *Llamas*, 73 P.R.R. 847, 854 (1952).

In *Piñán, supra*, we said that:

". . . We must bear in mind as to the definition of 'executive' of the above-mentioned regulation that there must necessarily exist all the requirements mentioned therein. Furthermore, the exclusion of an employee from the benefits of labor law because he is an executive must be clear. It should be strictly construed." *Mitchell* v. *Kentucky Finance Co.*, 359 U.S. 290, 295 (1958); *Dalehite* v. *United States*, 346 U.S. 15, 31 (1952).

the operation of machines whenever necessary." From the evidence which we turn to summarize it is evident that the solution of the controversy in this case depends on the interpretation and scope of subdivision 10 of the descriptive sheet, and, therefore, we are in the same position as the trial court to examine and consider the evidence presented on this entire question. *Morales* v. *Superior Court*, 84 P.R.R. 119 (1961), n. 3, p. 125; *Central Igualdad, Inc.* v. *Sec. of the Treas.*, 83 P.R.R. 44, 51 (1961); *Castro* v. *Meléndez*, 82 P.R.R. 556, 559 (1961); *Sanabria* v. *Heirs of González*, 82 P.R.R. 851, 963 (1961).

The evidence showed that 24 percent of the working time which appellee devoted to "help in the operation of the machines whenever necessary" included not only the productive operation of the machines, which clearly is the same manual work which her subordinates performed, unquestionably not exempt from the requirement of overtime pay pursuant to Regulation No. 13 to which we refer, but that it also comprised (a) working side by side with her subordinates in the discussion and solution of the problems concerning the operation and functioning of the IBM machines; (b) correcting failures in the functioning of the machines; (c) feeding and setting them up to obtain the best result in the work of her subordinates by the wiring thereof and the designing of forms; and, in general, (d) assisting and helping her subordinates in the working procedure of the machines. There was evidence that appellee devoted between 10 and 15 percent of her working time to the manual operation of the machines in question in their normal and current production. The question for decision is whether the balance up to 24 percent of her working time devoted, according to the evidence, to the wiring of the machines, that is, preparing them as a previous, necessary, and indispensable step for the functioning of the normal and current production of the machines, and to other incidental activities which we have

just related, constitute work not exempt from the require-
ment of overtime pay in this case. To this effect, it is proper
to make a brief analysis of the evidence in this case.

Appellee testified that during the first period involved in
the claim she was in charge of about six employees and
eight machines; supervised their work and some times worked
as machine tender when there were not enough employees;
at the beginning of the day's work it took her about 20 to
25 minutes to explain to certain employees what they had
to do, and then "she would sort, tabulate, handle cables com-
ing from abroad, do all the wiring and the machine panels,
two or three a day; she worked all day on the machines
and in the wiring, most of the time, half and half, that is,
half of the time operating them and the other half getting
them ready; that the sheet describing her functions is correct
as to the work performed by her, but not as to the percent-
age; that that sheet was prepared and signed by appellee
and approved by her immediate supervisor; that the design-
ing of forms and wiring were the most important part and
which took her more time; that the wiring is like doing the
matrix of the work in order that the other employees may
work, the basis for the other operators to work on; that the
wiring of a panel took her more time than the rest of the
work itself, and that preparatory operation had to be done
for each type of work required of the office in charge of
appellee; this was a specialized work, it was not done by
common employees; the designing of forms was of a similar
nature and category; that she devoted 20 percent of her
time to supervision and 80 percent to physical work, includ-
ing the wiring of the machines and the designing of forms,
which were the jobs which took her more time; that she
performed 33 percent of the machine work, and that that 33
percent included the wiring of the panels; that during sev-
eral months she devoted to the work of "helping with the
operation of the machines whenever necessary" more time

than what is shown in the sheet describing her functions, namely, 30 percent of her time, but she did not set it forth on that sheet.

Appellee's supervisor, Jorge Blay, testified that the work of "helping with the operation of the machines" consisted in wiring them, sitting down with the employees to discuss their problems, finding out why the work was not finished on time, if any machine was out of order or the wiring poorly done or some wire which was loose, investigating the reasons why the employees were not able to finish their work on time, and working directly with the machines, and that all of this took from 24 to 25 percent of appellee's time; that appellee devoted from 10 to 15 percent of her time to the wiring, correction, and inspection of the machine panels, and from 10 to 15 percent of her time to working directly and exclusively with the machines, the latter being part of the training of an employee or whenever he had some problem in the procedure, or in case of absence of employees; and, lastly, "also in emergencies, also at the close of the year." Blay testified that "the wiring of panels is the most important and complicated part of the tabulation work, since the wired panel is the part of the machine which indicates what is going to be produced by means of the wires, and by the impulses produced by the machine the necessary information is obtained on the form set up. It also requires certain knowledge, since the form must be set up in accordance with the wiring and the hammers or types of the machine which is going to do the printing, so that the printing to be done on the left-hand side may not come out on the right-hand side, and so forth, and hence the need to design the form in such a way in accordance with the wiring or with the process to be followed." This witness admitted that appellee worked one and one-half or two extra hours every day and one or three Sundays a year at the close of the financial year, and testified that the overtime work consisted mostly in

"coordinating the work produced during the day, planning for the next day, organizing and coordinating the work, the materials, etc., for the following day, reviewing her schedule of work to determine the next job scheduled, and so forth, discussing personnel matters, machine problems or of such and such a machine, that the IBM engineer was called and has not arrived, and the work is being delayed for one reason or another," and on certain occasions she worked overtime with the employees of the second shift and in the wiring of the panels.

Three conclusions are evident from the foregoing summary of the evidence on the question under consideration, to wit: (a) that the work of productive operation of the machines and of the preparation, namely, of the wiring, preparation of forms, and assisting the employees with machine problems, etc., are comprised in item No. 10 "help with the operation of machines" of the sheet describing appellee's functions; (b) that at the most she devoted 30 percent of all her time to the functions outlined in item No. 10; and that (c) she devoted half of the time more or less to the productive operation of machines as would any other ordinary employee under her direction. Therefore, for the purpose of settling the issue posed by appellant's assignment, it is necessary to determine whether the time devoted to setting up machines and tasks incidental to that function constitutes activities not directly and closely related to the management of the enterprise, the supervision of the work of two or more employees of the enterprise, and the control of the employees under her direction. It was established, and the trial judge so determined, that appellee's recommendations on employment and dismissal, improvement, promotion or change of status of the employees under her direction received special attention, and that she exercised habitually and regularly discretionary powers.

■ We conclude that the activities associated with the preparation of the machines are directly and closely connected with the general functions of the office to which appellee was promoted at the commencement of the first period of her claim, since such work is auxiliary, necessary, and preparatory to the production work of the employees supervised by appellee and for which she was responsible. Such preparatory work was complicated, delicate, and required greater ability than is customarily needed or utilized by a production employee or machine tender. Hence, in minor operations such as that involved here, such work performed by an executive is directly and closely related to his responsibility for the work of his subordinates and the quality of the final product. Explanatory Bulletin of the United States Labor Department, Part 541, subd. 541-108.[4]

For the reasons stated, the judgment in this case will be reversed and the complaint dismissed.

---

[4] "(a) This phase brings within the category of exempt work not only the actual management of the department and the supervision of the employees therein, but also activities which are closely associated with the performance of the duties involved in such managerial and supervisory functions or responsibilities. The supervision of employees and the management of a department include a great many directly and closely related tasks which are different from the work performed by subordinates and are commonly performed by supervisors because they are helpful in supervising the employees or contribute to the smooth functioning of the department for which they are responsible. Frequently such exempt work is of a kind which in establishments that are organized differently, or which are larger and have greater specialization of function, may be performed by a nonexempt employee hired especially for that purpose. Illustration will serve to make clear the meaning to be given the phrase 'directly and closely related.'

· · · · · · · ·

"(d) *Set-up work is another illustration of work which may be exempt* under certain circumstances if performed by a supervisor. The nature of set-up work differs in various industries and for different operations. Some set-up work is typically performed by the same employees who perform the 'production' work: that is, the employee who operates the machine also 'sets it up' or adjusts it for the particular job at hand. Such set-up work is part of the production operation and is not exempt. *In other instances*

*the setting up of the work is a highly skilled operation which the ordinary production worker or machine tender typically does not perform.* In some plants, particularly large ones, such set-up work may be performed by employees whose duties are not supervisory in nature. *In* other plants, however, particularly *small plants, such work is a regular duty of the executive and is directly and closely related to his responsibility for the work performance of his subordinates and for the adequacy of the final product. Under such circumstances it is exempt work.*

"(e) *Similarly, a supervisor who spot checks and examines the work of his subordinates to determine whether they are performing their duties properly, and whether the product is satisfactory, is performing work which is directly and closely related to his managerial and supervisory functions.*

"However, this kind of examining and checking must be distinguished from the kind which is normally performed by an 'examiner', 'checker', or 'inspector' and which is really a production operation rather than a part of the supervisory function.

"(f) Watching machines is another duty which may be exempt when performed by a supervisor under proper circumstances. Obviously the mere watching of machines in operation cannot be considered exempt work where, as in certain industries in which the machinery is largely automatic, it is an ordinary production function. Thus, an employee who watches machines for the purpose of seeing that they operate properly or for the purpose of making repairs or adjustments is performing nonexempt work. On the other hand, *a supervisor who watches the operation of the machinery in his department in the sense that he 'keeps an eye out for trouble' is performing work which is directly and closely related to his managerial responsibilities. Making an occasional adjustment in the machinery under such circumstances is also exempt work.*" (Italics ours.)