**MOUNT GRAHAM COALITION, et al., Plaintiffs–Appellees,**

**v.**

**Jack Ward THOMAS, Chief of the United States Forest Service; Michael Espy, Secretary of the Department of Agriculture; Bruce Babbitt, Secretary of the Department of Interior; and Mollie Beattie, Director of the United States Fish and Wildlife Service, Defendants–Appellants,**

**State of Arizona Board of Regents, Defendant–Intervenor– Appellant.**

**Nos. 94–16324, 94–16632.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 16, 1994.

Decided April 24, 1995.

M. Alice Thurston, Dept. of Justice, Washington, DC, for defendants-appellants.

Thomas M. Thompson, The University of Arizona, Tucson, AZ (on the briefs), and David C. Todd, Patton Boggs, L.L.P., Washington, DC (on the briefs and argued), for defendant-intervenor-appellant.

Eric Glitzenstein, Meyer & Glitzenstein, Washington, DC (on the briefs and argued), for plaintiffs-appellees.

---

Before: ALARCON and HALL, Circuit Judges, and KING,* Senior District Judge.

ALARCON, Circuit Judge.

This case represents another challenge to the Mount Graham international observatory project. *See Apache Survival Coalition v. United States,* 21 F.3d 895 (9th Cir.1994) (*"Red Squirrel IV"*); *Mt. Graham Red Squirrel v. Espy,* 986 F.2d 1568 (9th Cir. 1993) (*"Red Squirrel III"*); *Mt. Graham Red Squirrel v. Madigan,* 954 F.2d 1441 (9th Cir.1992) (*"Red Squirrel II"*); *Mt. Graham Red Squirrel v. Yeutter,* 930 F.2d 703 (9th Cir.1991) (*"Red Squirrel I"*). On May 25, 1994, a coalition of environmental groups and individuals ("Coalition") seeking to protect an endangered subspecies of red squirrel filed this action challenging the approval by the United States Forest Service ("FS") and the United States Fish and Wildlife Service ("FWS") (collectively "federal defendants") of a construction site for a large binocular telescope ("LBT") on Peak 10,477 in Mount Graham, Arizona, under the authority of the Arizona–Idaho Conservation Act, Pub.L. No. 100–696, §§ 601–607, 102 Stat. 4597, 4597–99 (1988) ("AICA"). The University of Arizona ("University"), the party proposing to build the telescope, successfully moved to intervene as a defendant. The Coalition contended that the FS and FWS failed to comply with the requirements of section 7 of the Endangered Species Act, 16 U.S.C. § 1536 ("ESA"), and section 102 of the National Environmental Policy Act, 42 U.S.C. § 4332 ("NEPA"), in approving the construction site for the telescope.

Ruling on cross-motions for summary judgment, the district court agreed. The district court concluded that the exemption from compliance with environmental laws provided in AICA did not encompass Peak 10,477 approved by the FS and FWS. The court granted the Coalition's motion and declared that the federal defendants had violated section 7 of the ESA, 16 U.S.C. § 1536, "by failing to pursue formal consultation before approving the relocation of the [LBT]" and section 102 of the NEPA, 42 U.S.C. § 4332, "by failing to prepare an Environmental Impact Statement ... before approving the relocation of the LBT." The district court permanently enjoined the federal defendants from permitting "any further construction or site preparation activities in connection with the LBT" to take place prior to full compliance with the ESA and NEPA. The federal defendants and the University appealed.

We affirm because we conclude that the AICA does not provide the FS with the authority to locate the LBT at a site other than that indicated in the 1988 biological opinion prepared by the FWS without complying with the requirements of the ESA and NEPA.

I.

Much of the historical background of the current dispute is set out in our prior opinions. *Red Squirrel IV,* 21 F.3d at 898–901; *Red Squirrel III,* 986 F.2d at 1569–71; *Red Squirrel II,* 954 F.2d at 1443–44. We accordingly focus our factual summary upon the events relevant to this matter.

In 1984, the University of Arizona, leading an international consortium, proposed to the United States Forest Service the construction of several telescopes on Mount Graham in the Coronado National Forest in southeastern Arizona. This area was the last remaining undisturbed habitat of the highly endangered red squirrel.

In response, the FS began preparing an Environmental Impact Statement ("EIS") pursuant to NEPA, 42 U.S.C. § 4332(2)(C). In a draft EIS released in October, 1986, the FS identified High Peak in Mount Graham as its "preferred alternative" location for construction of the telescopes. In 1987, the FS completed a biological assessment of this preferred alternative pursuant to section 7 of the ESA, 16 U.S.C. § 1536. Because the FS recognized that the telescope project could

* Honorable Samuel P. King, Senior United States District Judge for the District of Hawaii, sitting by designation.

adversely affect the red squirrel, it entered into formal consultation under the ESA with the Fish and Wildlife Service to determine whether and under what circumstances the construction could proceed without hastening the extinction of the red squirrel.

Before the consultation was finished, the University modified its proposal to request approval for the construction of three telescopes on High Peak and four on Emerald Peak in Mount Graham, including one on Peak 10,477, along with support facilities and access roads.

The FS conducted a new biological assessment and reinitiated formal consultation with the FWS. Pursuant to section 7 of the ESA, 16 U.S.C. § 1536, in July, 1988 the FWS issued a biological opinion concluding that the red squirrel was "extremely vulnerable to extinction" and that construction of the telescopes was likely to jeopardize their continued existence. Nevertheless, the FWS proposed "reasonable and prudent alternatives" ("RPA") to the action which could allow the project to proceed while providing some protection for the red squirrel.

The FWS found that construction on Emerald Peak could critically damage the red squirrel's likelihood of survival. The FWS therefore recommended either that the project be prohibited altogether, or that the telescopes be built on High Peak only. However, a third RPA ("RPA 3") suggested that construction could be done on Emerald Peak, providing that a detailed list of conditions designed to protect the red squirrel were fulfilled. In RPA 3, the FWS specified that three telescopes, support facilities, and an access road could be built on Emerald Peak if they were "clustered off the west end of the existing fuelbreak" and utilized no more than 8.6 acres. The FWS attached a map indicating the location of the three telescopes and the location of a single access road ("RPA 3 Figure A"). Peak 10,477 was not among the telescope locations noted on this map.

The FWS noted that, under RPA 3, "[t]wo middens[1] could be directly or indirectly affected." The FWS required that a monitoring program be implemented if RPA 3 were adopted to acquire information relating to the effect of the project on the red squirrel which could be used in decision making regarding future telescope proposals.

At this point, the FS normally would have selected one of the three alternatives. 50 C.F.R. § 402.15. Instead, Congress intervened. In October, 1988, Congress passed the Arizona–Idaho Conservation Act, Pub.L. No. 100–696, §§ 601–607, 102 Stat. 4597, 4597–99 (1988). Under the AICA, Congress provided that the construction of three telescopes, support facilities, and an access road should proceed "immediately"—without the delay attributable to compliance with the ESA and NEPA. AICA § 602(a). Congress stated that "[s]ubject to the terms and conditions of Reasonable and Prudent Alternative Three of the Biological Opinion, the requirements of section 7 of the Endangered Species Act shall be deemed satisfied as to the issuance of a Special Use authorization for the first three telescopes." AICA § 602(a). Congress further deemed that the requirements of the NEPA were "satisfied [w]ith reference to the construction of the first three telescopes, related facilities, and the access road." AICA § 607. The AICA also provided that authorization for the construction of four additional telescopes on Emerald Peak would require full compliance with the ESA and NEPA. AICA § 603. The AICA restricted the site for all seven telescopes to 24 acres within a 150–acre area of Mount Graham as depicted on a map referenced in section 601(b) of the AICA. AICA § 601(b).

Shortly after the AICA was enacted, the FS released an EIS on the telescope project. The EIS identified the provisions of RPA 3 as the FS's preferred plan of action. The EIS included a map sketching the locations of the first three telescopes similar to RPA 3 Figure A. Moreover, the EIS described the possibility of siting four additional telescopes on Mount Graham, indicating Peak 10,477 as one potential location.

The AICA and RPA 3 required the University and the Secretary of Agriculture to develop "a management plan to govern the

---

1. In this context, middens are sites in which red squirrels store seed cones.

construction and operation of the astrophysical complex and the associated road systems." AICA § 604. In April, 1989, the Secretary of Agriculture issued the University a Special Use Permit and Management Plan. The Permit stated that RPA 3 "is hereby incorporated into this permit by reference." The Management Plan required compliance with RPA 3, and incorporated a site map similar to RPA 3 Figure A.

Subsequent to the issuance of the permit, the University proposed sites for construction. The FS consulted the FWS, evaluated the proposals, and approved locations different from those sketched in RPA 3 Figure A. Ultimately, one telescope was sited roughly 750 feet to the southeast of the spot indicated on RPA 3 Figure A, and the other was also moved a short distance away. The Maintenance Building was located approximately 200 feet southeast of the site noted on RPA 3 Figure A, and the access road was redirected to conform to the terrain and avoid a squirrel midden.

After building the first two telescopes, in March, 1993 the University submitted a request to the FS that it consider four possible locations for the construction of the third telescope, the LBT. In addition to the site sketched in RPA 3 Figure A, the University requested that the FS consider Peak 10,298, Peak 10,477, and Peak 10,416. Peak 10,477 is located approximately 1,300 feet to the east of the LBT site noted in RPA 3 Figure A.

Upon learning of the University's request, the FWS initially expressed its opinion that locating the LBT on Peak 10,298 or 10,477 would necessitate formal consultation under section 7 of the ESA. The FWS felt consultation was required because Peak 10,298 violated the "cluster" concept of RPA 3, and because Peak 10,477 "would create two nodes of disturbance and violate[ ] the integrity of the 'cluster'" which was "the core of the alternative." The FWS did "not believe that Congress, in enacting [the AICA], envisioned such a potentially major change in the site plan when they exempted the three-telescope observatory from additional compliance with the terms of the [ESA] or the [NEPA]."

In November, 1993, the University withdrew its request with regard to Peak 10,298. The University continued to pursue Peaks 10,477 and 10,416, but not the RPA 3 Figure A spot because new squirrel middens had been discovered in the area of that location.

Around the same time, the FS completed a biological assessment and evaluation of the University's original four-site proposal. The FS found that locating the LBT at Peak 10,477 would create a mirror image of the cluster depicted in RPA 3 Figure A, therefore fulfilling the cluster requirement. The FS further found that "the impacts to the Mt. Graham red squirrel would be less at the ALT 2 [Peak 10,477] location than any of the others," in part because squirrel activity had increased in the other areas and so fewer middens would be affected.

The FWS thereafter conducted another review of the sites. The FWS noted that "[s]ince 1988, there have been several changes to the site plan contained in RPA 3.... All of these changes were, at most, neutral changes as far as effects to red squirrels or their habitat." The FWS agreed with the FS that Peak 10,477 "is the least damaging of the four alternatives to red squirrels" and that placing the LBT at the RPA 3 location "could have greater effects than those envisioned in 1988." In addition, the FWS reconsidered its position on the issue of formal consultation, concluding that locating the LBT on Peak 10,477 would not require formal consultation because it "retains the cluster concept of RPA 3 and does not appear to increase adverse effects to red squirrels beyond that considered in the 1988 biological opinion."

On December 6, 1993, without conducting formal consultation under the ESA or performing supplemental environmental analysis under the NEPA, the FS approved Peak 10,477 for the LBT. Immediately thereafter, the University began to cut down trees, although further work was postponed pending the finalization of detailed plans.

On May 25, 1994, the Coalition filed this action contending that the federal defendants had violated the ESA and NEPA by approving the location of the LBT at Peak 10,477 without conducting formal consultation under

the ESA, and without doing supplemental environmental analysis under the NEPA. Ruling on the parties' cross-motions for summary judgment, the district court concluded that AICA does not afford the FS the discretion to approve a site for the LBT different from that noted on RPA 3 Figure A without complying with the requirements of the ESA and NEPA. The district court found that RPA 3 analyzed and approved a specific site for the LBT and that Figure A pinpointed a site which was not Peak 10,477. The district court interpreted the AICA to exempt from the ESA and NEPA only those sites indicated on RPA 3 Figure A. Therefore, the court concluded that Peak 10,477 was not encompassed by the exemption from the ESA and NEPA.

The court granted the Coalition's motion for summary judgment and declared that the federal defendants had violated section 7 of the ESA, 16 U.S.C. § 1536, "by failing to pursue formal consultation before approving the relocation of the [LBT]" and section 102 of the NEPA, 42 U.S.C. § 4332, "by failing to prepare an Environmental Impact Statement ... before approving the relocation of the LBT." The district court permanently enjoined the federal defendants from permitting "any further construction or site preparation activities in connection with the LBT" to take place prior to full compliance with the ESA and NEPA. The federal defendants and the University appealed.

## II.

Congress enacted the ESA and NEPA for the purpose of protecting the ecosystem for future generations. In enacting the ESA, Congress stated:

> The purposes of this chapter are to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] to provide a program for the conservation of · such endangered species and threatened species....·

16 U.S.C. § 1531(b). Congress declared its purpose in enacting the NEPA with the following statement:

> The purposes of this chapter are: To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality.

42 U.S.C. § 4321. The provisions of the ESA and NEPA must be adhered to unless Congress makes an exception. Congress made such an exception when it enacted the AICA. In the AICA, Congress provided that three telescopes could be built on Mount Graham without complying with the ESA and NEPA, so long as the terms and conditions of RPA 3 are followed.[2] By specifically referencing RPA 3, Congress clearly expressed its intent that the telescopes be constructed at the locations indicated within that alternative in Figure A. From the face of the statute, Congress appears to have exempted

---

2. The AICA provides:

Sec. 601. (a) The Secretary of Agriculture ... shall issue a Special Use Authorization, subject to the terms and conditions of Reasonable and Prudent Alternative Three of the Fish and Wildlife Service Biological Opinion, dated July 14, 1988....

. . . .

Sec. 602. (a) Subject to the terms and conditions of Reasonable and Prudent Alternative Three of the Biological Opinion, the requirements of section 7 of the Endangered Species Act shall be deemed satisfied as to the issuance of the Special Use Authorization for the first three telescopes....

. . . .

Sec. 604. (a) The University of Arizona ... shall develop and implement a management plan, consistent with the requirements of the Endangered Species Act and with the terms and conditions of Reasonable and Prudent Alternative Three of the Biological Opinion, for the Site.

. . . .

Sec. 607. With reference to the construction of the first three telescopes, related facilities, and the access road within the boundaries of the Site described in section 601, the requirements of section 102(2)(c) of the National Environmental Policy Act of 1969 shall be deemed to have been satisfied.

AICA §§ 601(a), 602(a), 604(a), 607.

only those sites from the requirements of the ESA and NEPA.

The federal defendants and the University argue that the AICA's exemption should not be so strictly construed. However, "[a]ny exemption from such humanitarian and remedial legislation [as the ESA and NEPA] must ... be narrowly construed, giving due regard to the plain meaning of statutory language and the intent of Congress. To extend an exemption to other than those plainly and unmistakably within its terms and spirit is to abuse the interpretative process...." *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493, 65 S.Ct. 807, 808, 89 L.Ed. 1095 (1945). The federal defendants and the University accordingly bear the burden of demonstrating that the new LBT site falls within the parameters of the AICA's exemption by showing that the AICA afforded the FS discretion to select a site different from that indicated in RPA 3 Figure A. They have not carried this burden.

The parties agree that Peak 10,477 is a location different from that indicated for the LBT in RPA 3 Figure A. However, the federal defendants and the University contend that the AICA affords the FS discretion to relocate the LBT to a site different from that noted in RPA 3 without complying with the ESA and NEPA. The district court's conclusion to the contrary rests upon its interpretation of the AICA and is therefore reviewed de novo. *Red Squirrel III*, 986 F.2d at 1571. "The court's findings of fact are reviewed for clear error." *Id.* The position of the federal defendants and the University is not supported by the provisions of the AICA, which indicate that Congress exempted from the ESA and NEPA only the LBT location indicated in RPA 3 Figure A.

Three sections of the AICA explicitly direct that its provisions are "subject to the terms and conditions of Reasonable and Prudent Alternative Three." AICA §§ 601(a), 602(a), 604(a). We must decide whether the telescope locations indicated in RPA 3 Figure A are among the "terms and conditions" of

RPA 3 incorporated by the AICA.[3] If they are, building the LBT on a site other than that indicated in RPA 3 Figure A would require compliance with the ESA and NEPA. If they are not, the exemptions from the ESA and NEPA provided in the AICA would retain their force and the University would be able to proceed with construction without entering into consultation with the FWS or preparing an environmental impact statement for the new site.

The federal defendants and the University argue that the AICA incorporates neither the language requiring the telescopes be located to the west of the fuelbreak, nor RPA 3 Figure A that indicates the location of the telescopes. Rather, they conclude that because the AICA refers repeatedly to the "terms and conditions" of RPA 3, it incorporates only those provisions of RPA 3 which themselves are named "terms and conditions."

RPA 3 is an elaborate and detailed plan, describing procedures for transportation to and from the observatory, reforestation, fence construction, access to walking paths, construction inspection, ecological studies, periodic road closures, and even snow blowing. Only two of its provisions, however, are labelled "terms and conditions":

> The following terms and conditions must be complied with in order to implement the above measures:
>
> 1. All red squirrels killed, wounded or harmed by vehicles or other human related causes shall be immediately reported to the Service's Phoenix Ecological Services Office. The handling and disposition of all carcasses will follow service procedure.
>
> 2. Red squirrels near Emerald Peak should be monitored for their response to construction and operation of the Observatory, and this monitoring should be reported semi-annually to the Service's Phoenix Ecological Services Office.

Under the reasoning of the federal defendants and the University, Congress entirely exempted the first three telescopes of the

---

**3.** The parties agree that if the telescope site does not conform to the terms and conditions of RPA 3, it is not exempted from the requirements of the ESA and NEPA. The dispute centers on

what these terms and conditions are, and whether the FS possesses the discretion to select telescope sites that differ from those in RPA 3 Figure A.

observatory complex from the prudent protections embodied in the ESA and NEPA with only two simple conditions: the University must report all dead squirrels and must monitor squirrel reaction to construction.

This interpretation conflicts with our prior decisions which establish that the AICA incorporates the whole of RPA 3, rather than simply that small fraction labelled "terms and conditions." In *Red Squirrel II,* we explained that in enacting the AICA, Congress rejected legislation proposed by the University that would have allowed the University free reign to develop the site as it wished. *Red Squirrel II,* 954 F.2d at 1446. Instead, "Congress essentially assumed the role the Forest Service would ordinarily have played and made a selection among the three 'reasonable and prudent' alternatives, choosing Alternative Three." *Id.* We recently reaffirmed this interpretation of congressional intent with respect to RPA 3 in *Red Squirrel IV,* 21 F.3d at 900. The phrase "terms and conditions" in the AICA refers to the whole panoply of protections and restrictions embodied in RPA 3, including the telescope locations prescribed in Figure A. Nothing in the language of the AICA indicates that Congress intended to waive the ESA and NEPA requirements for a site other than that specifically identified in RPA 3, or to provide the FS with the authority to deviate from RPA 3 Figure A without complying with the ESA and NEPA.[4]

This conclusion is supported by three additional points. First, the provisions of the AICA altering RPA 3 demonstrate that Congress did not intend to change the location specifications in RPA 3 Figure A, or broaden the scope of the environmental law exemption provided in the AICA beyond the locations noted in RPA 3 Figure A. In AICA, Congress expressly altered features of RPA 3 involving special use authorizations for summer homes and a bible camp. AICA § 605. RPA 3 required that these special

permits would not be renewed, but AICA provided that they "shall continue." AICA § 605. Congress did *not,* on the other hand, provide that sites indicated on the map referenced in RPA 3 or the "cluster" concept which was key to RPA 3's goal of minimizing harm to the red squirrel should or could be changed. Congress thereby demonstrated that it made whatever changes in RPA 3 which were required to further its intent. Since Congress did not indicate that the sites specified in RPA 3 Figure A could be changed at the discretion of the FS, we must assume that the exemption to the requirements of the ESA and NEPA was limited to the sites indicated in RPA 3 Figure A.

Second, section 602(a) of the AICA shows that Congress did not intend to waive the ESA and NEPA requirements for the new LBT location. Section 602(a) provides that section 7 of the ESA is "deemed satisfied" for "*an* access road to the Site." AICA § 602(a) (emphasis added). The district court found that relocating the LBT to Peak 10,477 would require the construction of an additional access road. The University argues that the new road is merely a "short spur road leading from the AICA-sanctioned 'access road'." However, the record demonstrates that RPA 3 and AICA contemplated a single access road running straight through to each of the three telescopes. Locating the LBT at Peak 10,477 would disrupt this flow, instead requiring somewhat of a "Y" shaped road. The district court's finding that this did not qualify as a single access road was not clearly erroneous. This finding supports the district court's holding that Congress did not contemplate that construction on Peak 10,477 would be exempt from the ESA and NEPA.

Finally, the AICA evidences Congress' intent that the telescope project get underway promptly after the passage of the Act. Sec-

4. The federal defendants and the University argue that the AICA allotted the FS discretion to locate the first three telescopes within the 150-acre specified area, providing that the telescopes occupied no more than 24 total acres. This is not an accurate reading of the AICA. Section 601(b) provides that all seven of the proposed telescopes should be located within the pre-

scribed area. AICA § 601(b). This provision thereby set the parameters for the location possibilities of the four additional proposed telescopes—they, together with the first three whose locations were specified in RPA 3 Figure A, may not occupy more than 24 acres within the specified 150-acre area.

tion 602(a) requires that the Secretary of Agriculture *"immediately* approve" the construction of the first three telescopes, support facilities, and an access road. AICA § 602(a) (emphasis added). In order to facilitate immediate action and preclude lengthy debate as to the locations upon which the initial three telescopes would be built, Congress referenced and incorporated RPA 3. It is apparent from the language of the AICA and the urgency with which it was enacted, *see Red Squirrel II,* 954 F.2d at 1454–56, that Congress intended to settle the controversy surrounding the telescope project by authorizing the immediate construction of three telescopes at the sites noted in RPA 3 Figure A. It is inconsistent with this aim to suggest that Congress would sanction the delays that would result from the selection of a different site and the litigation which would surely ensue.

We hold that the AICA does not provide the FS with the authority to select a site for the LBT other than that indicated in RPA 3 Figure A without complying with the ESA and NEPA. Our conclusion does not compel the construction of the LBT on the site noted in RPA 3 Figure A regardless of new environmental information or the effect it could have on the red squirrel. Rather, we simply hold that, in order to relocate the LBT, the FS must comply with the requirements of the ESA and NEPA.

AFFIRMED.

CYNTHIA HOLCOMB HALL, Circuit Judge, dissenting.

Because I think that the AICA confers discretion on the Forest Service to site the telescopes as it sees fit, so long as those locations are within the twenty-four acre "Site" described in section 601(b) of the AICA, and because I believe we are bound to defer to the Forest Service's own reasonable interpretation of the AICA, I respectfully dissent.

In 1988, Congress attempted to shield the Mt. Graham International Observatory from the otherwise inevitable years of delay in litigation by exempting the construction of the first three telescopes of the Mt. Graham International Observatory—which eventually

will include seven telescopes—from the section 7 consultation requirements of the ESA:

> Subject to the terms and conditions of Reasonable and Prudent Alternative Three of the Biological Opinion, the requirements of section 7 of the Endangered Species Act shall be deemed satisfied ... and the Secretary *shall immediately approve the construction* of the following items:
>
> (1) three telescopes to be located on Emerald Peak;
>
> (2) necessary support facilities; and
>
> (3) an access road to the Site.

AICA § 602(a) (emphasis added). Congress also exempted construction of the first three telescopes from the requirements of NEPA:

> With reference to the construction of the first three telescopes, related facilities, and the access road *within the boundaries of the Site described in section 601,* the requirements of section 102(2)(c) of the National Environmental Policy Act of 1969 shall be deemed to have been satisfied.

AICA § 607 (emphasis added).

Section 601(b) defines the "Site" on which construction is to occur: "The Site ... shall include not more than 24 acres within the 150–acre area of the Coronado National Forest, Arizona, as generally depicted on a map entitled, 'Mount Graham International Observatory Site', dated July 28, 1988." Nowhere does AICA specifically refer to the schematic map attached as Figure A to RPA 3.

Thus, contrary to the majority's assertion, *see* maj. op. at 974, the statute does not on its face exempt construction from the consultation process only so long as the Forest Service builds the first three telescopes in the precise locations indicated in RPA 3 Figure A. At best, the language could be read to incorporate the map by reference. Even to accept this proposition, however, I would have to believe that Figure A constitutes a "term or condition" of RPA 3. Of this, I remain unconvinced.

First, the "Site" for which Congress crafted the exemption from the environmental laws is different from the "site" described by Figure A, which proposes that only 8.6 acres

be used in construction of the first three telescopes. The AICA, however, makes reference to the twenty-four acre "Site" both in its waiver of ESA § 7 (AICA § 602(a)(3)) and in its waiver of NEPA § 102(2)(c) (AICA § 607). Therefore, even if·RPA 3 does by its terms limit construction to the locations depicted in Figure A (again, a disputable proposition), I do not believe that Figure A can limit the AICA's explicit and unequivocal exemption for the twenty-four acre Site within the 150 acres described in the July 28, 1988 map. In other words, the "Site" defined in the statute trumps the "site" shown in Figure A, which is only an addendum to RPA 3—a document whose mere "terms and conditions" were incorporated by. reference.

· The majority, however, attempts to minimize the conflict between the "Site" described in the statute and the "site" depicted in Figure A by reasoning that the twenty-four acre "Site" sets the boundaries of all seven telescopes, rather than just the first three that are at issue in this case. *See* maj. op. at 976 n. 4. This argument is not persuasive because it would require us to imbue the phrase "terms and condition" with one meaning in section 601 and another in section 602.

The first section of the AICA orders the Secretary to issue a special use authorization for the "Site." AICA § 601(a). Issuance of this authorization for the "Site" is subject to the terms and conditions of RPA 3. *Id.* Thus, if Figure A is truly a term or condition of RPA 3, the "Site" for which the special use authorization is to issue should also be limited to the 8.6 acres depicted in Figure A. Such a reading, however, would be nonsensical in the face of the explicit statutory language defining the "Site" as twenty-four acres within the 150 acres depicted on the July 28, 1988 map, and the Majority recognizes this in its acknowledgment that all seven telescopes are to be constructed within the boundaries of the Site. Maj. op. at 976 n. 4.

Section 602 then uses identical language— "[s]ubject to the terms and conditions of Reasonable and Prudent Alternative Three"—in its exemption of the first three telescopes from section 7 of the ESA. Un-

der the majority's approach, Figure A suddenly rises to the level of a "term or condition" for the exemption from the consultation requirement, even though it did not qualify as a "term or condition" for the issuance of the special use authorization. Thus, the majority's reading of "Site" treats Figure A as a "term or condition" for purposes of section 602, but not for section 601. I cannot countenance such an approach. Because Figure A cannot be considered a "term or condition" for purposes of section 601, it cannot be a term or condition for purposes of section 602.

Furthermore, the FS has consistently acted in a manner that implicitly indicates that it interprets the AICA's grant of authority to build the Observatory Complex to mean that it retains discretion to site the telescopes as it sees fit, so long as the construction zone does not exceed the twenty-four acres to which section 601(b) refers. The majority itself observes:

> Subsequent to the issuance of the permit ... [t]he FS consulted the FWS, evaluated the proposals, and approved locations different from those sketched in RPA 3 Figure A. Ultimately, one telescope was sited roughly 750 feet to the southeast of the spot indicated on RPA 3 Figure A, and the other was also moved a short distance away. The Maintenance Building was located approximately 200 feet southeast of the site noted on RPA 3 Figure A, and the access road was redirected to conform to the terrain and avoid a squirrel midden.

Maj. op. at 973.

The FS has also *explicitly* referred to Figure A as merely a "conceptual layout" that does not limit its discretion in choosing final locations for the telescopes. For example, in the Final Environment Impact Statement the FS issued shortly after passage of AICA, the Forest Service referred to the layout Figure A depicts as merely "conceptual." *See* Final EIS at 2–46.

This Court must give substantial deference to the FS's interpretation of the AICA, as evidenced by its actions in making substantial deviations from Figure A in previous siting decisions, and by its written interpretation in the final Environmental Impact

Statement. The FS is the federal agency charged with administering the terms of the AICA. As such, we· accord it substantial deference in its interpretations of the statute. *See Utility Reform Project v. Bonneville Power Admin.*, 869 F.2d 437, 442 (9th Cir. 1989). Such deference is "especially appropriate" when, as here, "the enabling legislation is highly technical and [the agency] was intimately involved in drafting much of that legislation." *Id.*

As this Court stated in *Mount Graham Red Squirrel v. Espy*, 986 F.2d 1568, 1575 (9th Cir.1993), "[i]t is difficult to believe that Congress intended to force the Forest Service to resort to the procedures for approving new uses every time a change in the monitoring program (or, indeed, any aspect of the observatory project) was found to be desirable." Because the FS's interpretation of the AICA is based on a "permissible construction of the statute," *cf. Citizens for Clean Air v. E.P.A.*, 959 F.2d 839, 844 (9th Cir.1992), this Court should defer to it.

This appeal gives rise to the fifth published opinion from this Court addressing legal challenges to the construction of the Mt. Graham International Observatory. I find this fact remarkable in light of Congress's recognition in 1988 of the "necessity of short-circuiting the customary environmental procedures," *Mt. Graham Red Squirrel v. Madigan*, 954 F.2d 1441, 1455 (9th Cir.1992), to insure the "immediacy of construction to the first three telescopes." *Id.* at 1554. I find the further delay imposed by today's decision especially regrettable in light of the fact that the FS appears to have chosen to locate the LBT on Peak 10,477 in good faith and for laudable reasons: Peak 10,477, according to the FWS, is now the location that would cause the least disruption to the squirrel's habitat. I therefore dissent.